No. 101,657

STATE OF KANSAS, *Appellee*, v. ELGIN RAY ROBINSON, JR., *Appellant.*

(270 P.3d 1183)

1003

1004

Opinion filed March 2, 2012.

*Reid T. Nelson*, of Capital and Conflicts Appellate Defender Appeals Office, argued the cause and was on the briefs for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: A jury convicted Elgin Ray Robinson, Jr., of capital murder, rape, aggravated kidnapping, aggravated indecent liberties with a child, and violation of a protection from abuse (PFA) order. The 14-year-old victim of Robinson's crimes, C.B., was 9 months' pregnant with Robinson's child at the time of her murder.

Following the penalty phase of the trial, the jury was unable to reach a unanimous verdict regarding imposition of the death penalty, and the district court sentenced Robinson to life imprisonment without parole, plus 247 months.

In this direct appeal of his convictions and sentence, Robinson seeks a new trial arguing the trial court erred by (1) failing to suppress evidence regarding Internet searches Robinson conducted prior to the murder in which he searched for information on how to kill a baby, how to have a miscarriage, and how to find a missing person; (2) failing to suppress "somewhat inculpatory" statements Robinson made to police regarding his knowledge of C.B.'s disappearance and murder; (3) admitting hearsay statements of C.B. under the forfeiture by wrongdoing exception to the hearsay rule; (4) admitting repetitious photographs of C.B.'s body as it was uncovered from a shallow grave; (5) denying Robinson's motion for a change of judge based on judicial bias; and (6) instructing the jury on the State's burden of proof. Additionally, Robinson challenges his sentence for capital murder, arguing the identical offense doctrine entitles him to resentencing on that conviction. Finding no reversible errors, we affirm Robinson's convictions and sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of June 9, 2006, C.B. went to a skating rink in Wichita with several of her friends. At some point, C.B. left the skating rink with Robinson's friend, Everett Gentry. C.B. told her

friends that Gentry was taking her to meet Robinson. Through text messages, C.B. later told her friends that Robinson had not shown up and that Gentry would drop her off at the skating rink after Gentry took a friend home. C.B. never returned to the skating rink.

Six days later C.B.'s body was discovered buried face down in a shallow grave near a field in Butler County. Homicide detectives quickly focused their investigation on Gentry, who ultimately implicated himself, Robinson, and Theodore Burnett in C.B.'s murder.

The State charged Robinson with one count of capital murder in violation of K.S.A. 21-3439(a)(2) (intentional and premeditated killing pursuant to a contract or agreement or being a party to such contract or agreement), an off-grid person felony; one count of aggravated kidnapping in violation of K.S.A. 21-3421 (kidnapping by deception with intent to inflict bodily injury, see K.S.A. 21-3420[c], when bodily harm is inflicted), a severity level 1 person felony; two counts of rape in violation of K.S.A. 21-3502(a)(2) (sexual intercourse with a child under age 14), a severity level 1 person felony; an alternative count of aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(1) (sexual intercourse with a child 14 years of age), a severity level 3 person felony; and violation of a protection from abuse order in violation of K.S.A. 21-3843(a)(1), a class A person misdemeanor.

*Testimony of Everett Gentry*

At trial, the State established the following facts through Gentry's testimony.

Sometime during the fall of 2005, Robinson spoke with Gentry about C.B.'s pregnancy and mentioned that he could go to jail for impregnating C.B. Robinson eventually "started hinting that he needed to get rid of [C.B.]," and at some point, he asked Gentry to help murder C.B. in exchange for $1,000.

Initially, Gentry believed Robinson would kill C.B. Later, the two men decided that because Robinson would be the "number one suspect," he should be in Kansas City when Gentry kidnapped and murdered C.B. However, Gentry was unwilling to commit the

actual murder, so he decided to involve a third person, Theodore Burnett.

Gentry had known Burnett for a few months and sold drugs out of Burnett's apartment. In exchange, Gentry provided drugs to Burnett. Gentry told Burnett that his "brother" had a problem, needed someone killed, and would pay someone to do the job. Burnett agreed to assist.

Sometime before the murder, Gentry and Robinson selected a site near Andover to bury C.B.'s body. On the day of C.B.'s murder, Gentry drove to the site and dug a shallow grave. Later that day, Robinson called Gentry and told him C.B. would be at the skating rink that evening. Near dusk, Gentry picked up C.B. from the skating rink and dropped her off at his sister's empty apartment. Gentry told C.B. that Robinson was on his way, and he left.

Gentry then drove to Burnett's apartment, picked up Burnett, and returned to the apartment where C.B. waited. There, Burnett appeared shocked to learn that the intended murder victim was a young, pregnant girl. Burnett told Gentry that he needed to smoke crack cocaine to calm his nerves, so the two men returned to Burnett's apartment where Burnett smoked crack. Before leaving his apartment, Burnett grabbed some latex gloves and a VCR- or TV-type cord from a dresser in his living room. On the drive back to his sister's apartment, Gentry stopped at a Walgreens to purchase ground coffee and flashlights to be used in burying C.B.

When Gentry and Burnett returned, C.B was angry that Robinson had not shown up, and she wanted to go back to the skating rink. Gentry agreed to take her back after he took Burnett home. At Burnett's insistence, C.B. sat in the front passenger seat, and Burnett then sat directly behind her in the back seat.

Gentry drove toward Andover and as they neared the planned burial site, he tapped Burnett on the leg, signaling it was time to kill C.B. When Burnett hesitated, Gentry tapped him again. Burnett then reached over the front seat and strangled C.B. from behind with the cord. Afterward, Gentry stopped the car, and Burnett pulled C.B.'s body out of the car. Because C.B. "was still trying to breathe," Burnett placed a plastic Walgreens bag over her head "and tried to suffocate her again." The two men then dragged

C.B.'s body toward the grave and placed it face down in the grave. Gentry tossed C.B.'s sandals into the grave, and the men covered her body with dirt before departing.

Gentry missed a turn on the way back to Wichita and ended up in Rose Hill. As Gentry turned the vehicle around, Burnett took the cell phone C.B. had used, which remained in the vehicle, and threw it out the window. After they returned to Wichita, Gentry paid Burnett $350 in cash and drugs for his participation in C.B.'s murder.

When Robinson returned from Kansas City the following day, Gentry met with Robinson outside Robinson's grandmother's house and told him what had happened. Robinson did not want to know the details of the abduction and murder; instead, he just "wanted to know if [C.B.] was dead."

Robinson never paid Gentry the agreed-upon payment of $1,000 for the murder, but prior to the murder, Robinson gave Gentry cash to purchase shovels and flashlights.

*Other corroborating evidence*

The State presented other evidence corroborating key aspects of Gentry's testimony.

C.B.'s friends, A.K. and M.D., testified that in the days leading up to the murder, C.B. communicated with Robinson without her parents' knowledge and made plans to meet Robinson on the night of her murder. C.B. left the skating rink shortly after the girls arrived, taking M.D.'s cell phone with her. Throughout the evening, C.B. continued to communicate with her friends through text messages. C.B. messaged her friends that she left the rink with Gentry and that he took her to his apartment where she waited for Robinson. Later, C.B. texted her friends that Robinson failed to show up and that Gentry would bring her back to the rink after he took a friend home.

A.K. and M.D. attempted to call C.B. after her last message at about 10 p.m., but the phone went to voice mail, indicating to them that C.B.'s phone either was turned off or C.B. was talking on the phone.

Robert Taylor testified that on June 14, 2006, he drove to a field near Andover on his lunch break from a job at a nearby construction site. There, he noticed a lump or mound near the field and an odor that smelled as though "somebody buried an animal or something." He returned the following day with a coworker, Sam Clayton, to examine the mound more closely. Upon examination, Taylor and Clayton could see part of a body protruding from the mound. They immediately contacted the Butler County Sheriff's office, which in turn contacted the Wichita police.

Law enforcement officers testified that on June 15, 2006, C.B.'s body was uncovered, buried face down in a shallow grave in Butler County, near the entrance to a field. It appeared to the officers that C.B.'s white flip-flops had been "tossed in" after her body was placed in the grave. C.B.'s head was covered with two plastic Walgreens bags and a Playstation cord was tied around her neck. The medical examiner testified C.B. died as a result of ligature strangulation and that the pressure marks on both sides of C.B.'s neck suggested she was strangled from behind.

Through Detective Timothy Relph, the State presented testimony analyzing Gentry's cell phone records. The records showed that Gentry's phone communications with Robinson near the time of murder were transmitted through cell phone towers near Andover and Rose Hill.

Detective Relph also introduced a surveillance photo from the security camera at the Walgreens where Gentry and Burnett stopped on the night of the murder. Relph testified that during an interview with Gentry in March 2008, Gentry identified himself in the photo.

The State also introduced the cell phone C.B. used on the night of the murder, which was found by Rose Hill police in a ditch next to Rose Hill Road.

Robinson's girlfriend, Kimberly Walterscheid, testified she and Robinson were in Kansas City on the weekend of C.B.'s murder and that after they returned to Wichita, Gentry spoke with Robinson outside Robinson's grandmother's house.

Finally, Wichita Police Detective Robert Stone testified regarding evidence found during an internal search of a computer used

by Robinson in the months preceding C.B.'s murder. Specifically, Stone testified that his search revealed Robinson searched the Internet for information on how to kill a baby, how to have a miscarriage, and how to find a missing person.

*Robinson's testimony*

At trial, Robinson testified on his own behalf. He essentially admitted his guilt to the charges of aggravated indecent liberties and violation of the PFA order when he admitted to having sex with C.B. after she turned age 14 and to contacting C.B. in person and by phone after he had knowledge of the PFA order. Robinson maintained that he and C.B. did not have sex until the day after her 14th birthday, but he admitted paternity of C.B.'s unborn child.

Robinson denied he had any conversations with Gentry about kidnapping or murdering C.B., denied offering to pay Gentry or anyone else to murder C.B., and denied setting up a meeting with C.B. on the night of her murder. Robinson also claimed he did not know C.B. would be at the skating rink on the night she was murdered.

Nevertheless, Robinson admitted that before C.B. went missing, he spoke with Gentry about C.B.'s pregnancy and advised Gentry he was "in trouble." He explained to Gentry that C.B.'s parents wanted to put him in jail and that he could go to prison for 12 years. Robinson specifically testified he "told [Gentry] he needs to help me come up with somethin'."

Regarding his Internet searches, Robinson explained that he and C.B. initially talked about finding a way to prevent C.B. from having the baby, so he searched the Internet for information on how C.B. could have a miscarriage. Further, Robinson testified he and C.B. talked about running away, so he searched the Internet for information on how to solve a missing person case.

Robinson admitted he and Gentry exchanged several phone calls while Robinson was in Kansas City and that the two men met when Robinson returned from Kansas City. Further, Robinson conceded he told detectives that Gentry told him "the problem is taken care of," which Robinson understood to mean C.B. was dead.

Finally, Robinson admitted he communicated with C.B. via text messaging while he was in Kansas City and she was at the skating rink, but he claimed he did not receive any messages from C.B. after 6:40 p.m. on the night she was murdered. However, Robinson stipulated to the accuracy of his phone records, which indicated otherwise.

The jury found Robinson guilty of capital murder, one count of rape, aggravated kidnapping, aggravated indecent liberties with a child, and violation of the PFA order. Following the penalty phase of the trial, the jury was unable to reach a unanimous verdict regarding imposition of the death penalty, and the district court sentenced Robinson to life imprisonment without parole, plus 247 months.

Robinson timely appeals his convictions and sentence.

## ANALYSIS

*The trial court did not err in denying defendant's motion to suppress evidence of his Internet search activity.*

Prior to trial, Robinson moved to suppress evidence of Internet search activity obtained through the search of a computer Robinson used at the workplace of his mentor, Dan Reisig. Robinson contended the search violated his Fourth Amendment right to be free from unreasonable searches and seizures because the warrant was overly broad and not supported by probable cause.

The district court conducted two evidentiary hearings on the motion. Highly summarized, the evidence showed that following C.B.'s murder, Reisig gave the computer to his attorney, who then turned it over to law enforcement. Pursuant to a warrant, Detective Stone conducted an internal search of the computer and found that in the months preceding C.B.'s murder, Robinson searched the Internet for information on how to kill a baby, how to have a miscarriage, and how to find a missing person.

The district court denied Robinson's motion, finding Robinson lacked a reasonable expectation of privacy in the computer and therefore lacked standing to challenge the search. Based on this conclusion, the district court did not address Robinson's challenges to the validity of the search warrant.

On appeal, Robinson challenges the district court's determination that he lacked standing, and he reiterates his challenges to the validity of the search warrant. The State argues the district court properly found that Robinson lacked a reasonable expectation of privacy in his Internet search activity. Further, the State contends Robinson's claims regarding the warrant's validity are not properly before this court because they were not addressed by the trial court. Alternatively, the State argues that even if the trial court erroneously admitted the challenged evidence, the error was harmless in light of the substantial evidence of Robinson's guilt.

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment to the United States Constitution, which provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

See Kansas Constitution Bill of Rights, § 15.

Generally, evidence obtained by the government, either directly or indirectly, as the result of an unreasonable search or seizure cannot be used against the defendant in a criminal prosecution. See, *e.g.*, *Herring v. United States*, 555 U.S. 135, 139-46, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) (explaining limited applicability of exclusionary rule); *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (explaining fruit of the poisonous tree doctrine). The State bears the burden to prove the lawfulness of a challenged search or seizure. *State v. Morlock*, 289 Kan. 980, 985, 218 P.3d 801 (2009). However, the Fourth Amendment is not implicated when the defendant had no "reasonable" or "legitimate" expectation of privacy in the place searched. See *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).

*Robinson lacked a legitimate expectation of privacy in his Internet search activity.*

Thus, as a threshold inquiry, we must determine whether Robinson had a legitimate expectation of privacy in the evidence at issue here—*i.e.*, his Internet search activity on a third party's computer.

Although he was not Reisig's employee and he did not own the computer, Robinson generally argues he had a legitimate expectation of privacy in the contents of the computer because his account on the computer was password protected. The State contends Robinson lacked a reasonable expectation of privacy in the contents of the computer in light of Reisig's "unfettered, third-party access" to the computer and because Reisig specifically advised Robinson his Internet activity could be monitored.

To establish a legitimate expectation of privacy, a defendant must demonstrate a subjective expectation of privacy in the area searched and that the expectation was objectively reasonable. See *State v. Fisher*, 283 Kan. 272, 291-92, 154 P.3d 455 (2007) (finding the defendant maintained "a subjective expectation [of privacy] that was objectively reasonable" in a trash bag placed approximately 100 yards from the highway and behind the defendant's rural home). " 'The ultimate question is whether one's claim to privacy from the government intrusion is reasonable in light of all the surrounding circumstances.' [Citation omitted.]" *United States v. Angevine*, 281 F.3d 1130, 1134 (10th Cir. 2002) (public university employee had no objectively reasonable expectation of privacy in computer files containing child pornography when files were downloaded using the university network on a university-owned computer, university had explicit policies on the use of work computers, university warned employees that it reserved the right to randomly audit Internet use and that network systems administrators could view data downloaded from the Internet, and employees were permitted to use computers only for work-related purposes).

Here, the trial court found that Robinson had a limited subjective expectation of privacy in any password-protected documents, files, and folders found in the computer. But the court essentially

concluded Robinson had no objectively reasonable expectation of privacy in his Internet search activity because: (1) Reisig's company owned the computer; (2) Robinson accessed the Internet through the company's network; (3) as a network systems administrator, Reisig could access Robinson's computer and monitor Robinson's Internet activity; and (4) Reisig informed Robinson the company could monitor Robinson's use of the company's network, including his use of the Internet.

The trial court's factual findings are supported by substantial competent evidence. Reisig and Robinson both testified at the suppression hearing. Robinson testified he met Reisig while Robinson worked in the cafeteria of the office building in which Reisig's company was located. According to Robinson, when Reisig learned that Robinson aspired to own his own business, Reisig offered to mentor Robinson and invited him to use an extra computer in Reisig's office during business hours.

Reisig testified Robinson used a computer located in an open cubicle and that the computer was connected to Reisig's company's network. According to Reisig, he personally informed Robinson of the company's computer usage and privacy policies, and Robinson attended a company meeting in which Reisig discussed appropriate "web surfing" and computer use. Further, Reisig informed Robinson that the company had an automatic filter which tracked Internet usage and that the company could access networked computers through the use of administrative privileges.

Nevertheless, Robinson argues that because he had a log-in password, he had an expectation of privacy in his computer search activity. But Reisig testified that while Robinson's log-in password allowed Robinson access to the computer's desktop functions and file systems, Reisig's administrative privileges could override Robinson's log-in password. Further, Detective Stone testified he discovered evidence of Robinson's Internet search activity by searching the computer's tracking files, which were not password protected. Reisig also testified he could review websites visited by Robinson without requiring Robinson's password.

In sum, the evidence showed that Reisig allowed Robinson, a nonemployee, to use a networked computer in an open cubicle at

Reisig's place of business. Robinson utilized that computer knowing that his Internet activity was monitored by a network filter and that Reisig or anyone with administrative privileges also could monitor that activity. And while Robinson's log-in password may have protected some files, the only evidence at issue here—Robinson's Internet search activity—was not password protected.

Under these circumstances, Robinson lacked an objectively reasonable expectation of privacy in the Internet searches he conducted on Reisig's computer. Therefore, the district court did not err in finding that Robinson lacked standing to challenge the validity of the search warrant, and we affirm the denial of Robinson's suppression motion. This ruling moots Robinson's challenges to the validity of the search warrant and to the trial court's rulings regarding consent.

*The trial court did not err in denying Robinson's motion to suppress statements he made in a custodial interview.*

Robinson next contends he involuntarily made "somewhat inculpatory" statements during a custodial interview following the discovery of C.B.'s body and the district court erred in denying his motion to suppress these statements. The State argues the district court's factual findings regarding this issue are based on substantial competent evidence. Further, the State contends the trial court properly found, after considering the testimony of the officers and Robinson at the suppression hearing and reviewing the videotape, that Robinson's confession was voluntary based upon the totality of the circumstances.

On appeal, Robinson recognizes that throughout the nearly 5-hour custodial interview, he adamantly maintained his innocence, denying that he wanted C.B. kidnapped or killed or that he had any involvement in an agreement or contract to kill her. Nevertheless, he points out that during the interview he made statements implicating himself "to some extent," and he argues he made these statements involuntarily as a result of unduly coercive interview techniques used by law enforcement.

Specifically, Robinson points to statements he made to Detective Jeff Gilmore during the interview in which he admitted that several

months before C.B.'s murder he told Gentry that he was the subject of a PFA order, that he faced 12 years in prison, and that he hoped that there would be no DNA (of C.B.'s child) available for testing. Robinson also conceded to Gilmore that he knew C.B. would be at the skating rink on the day of her death. Further, Robinson eventually admitted to Gilmore that when Robinson returned from Kansas City on the Sunday following C.B.'s murder, he spoke with Gentry in person outside Robinson's grandmother's home. Robinson conceded that during that conversation, Gentry told Robinson "it was taken care of," which Robinson understood to mean C.B. was dead.

Robinson contends his statements resulted from direct and implied threats made to him by detectives regarding his failure to cooperate. Specifically, Robinson points out that during the interview, Detective Gilmore (1) urged Robinson to show his compassionate side because nobody would care about him if he lied; (2) urged him to tell the truth so "people in the case" would see him in more favorable light; (3) told him he could face the death penalty; and (4) suggested that "someone that will be judging" him would show him more sympathy if he told the truth. Further, Robinson notes that Detective Kelly Mar advised him to tell the truth and explained to him that it could be the difference between "the rest of [his] life and a needle in [his] arm."

We apply a dual standard when reviewing the trial court's decision on a motion to suppress. First, we review the factual underpinnings of the decision under a substantial competent evidence standard. Next, we review the trial court's legal conclusion drawn from those facts de novo. We do not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010).

*The totality of the circumstances support the trial court's finding that Robinson's statements were voluntary.*

When a defendant challenges his or her statement to law enforcement officers as involuntary, the prosecution must prove the voluntariness of the statement by a preponderance of the evidence. In determining whether the statement was the product of an ac-

cused's free and independent will, the trial court looks at the totality of the circumstances surrounding the statement and determines its voluntariness by considering the following nonexclusive list of factors:

" ' "(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." [Citation omitted.]' " *Stone*, 291 Kan. at 21 (quoting *State v. Johnson*, 286 Kan. 824, 836, 190 P.3d 207 [2008]).

K.S.A. 60-460(f) also governs the admissibility of a defendant's confession or statements. That statute provides:

"In a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged [is admissible], but only if the judge finds that the accused (1) when making the statement was conscious and was capable of understanding what the accused said and did and (2) was not induced to make the statement (A) under compulsion or by infliction or threats of infliction of suffering upon the accused or another, or by prolonged interrogation under such circumstances as to render the statement involuntary or (B) by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same." K.S.A. 60-460(f).

In arguing the interview techniques used by detectives in this case rendered his confession involuntary, Robinson relies primarily on *State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005). There, interrogating officers repeatedly lied to the defendant, who had been charged with several convenience store robberies, regarding the evidence they possessed against him. Officers also repeatedly urged the defendant to cooperate and "come clean" and threatened to report his lack of cooperation to the district attorney, which the officers said could result in additional robbery charges.

The court in *Swanigan* initially distinguished Kansas cases finding that a law enforcement officer's offer to convey a suspect's *cooperation* to the prosecutor, without more, does not render a confession involuntary. See *Swanigan*, 279 Kan. at 33-34 (and cases cited therein). However, the court then reviewed how other jurisdictions have treated an issue not previously considered by Kansas

courts—*i.e.*, whether threats by law enforcement officers to convey a suspect's *lack of cooperation* to the prosecutor can render a confession involuntary. 279 Kan. at 34-37.

The *Swanigan* court ultimately concluded that a law enforcement officer's threat to convey a defendant's lack of cooperation to a prosecutor is inconsistent with a defendant's right to remain silent as articulated in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). *Swanigan*, 279 Kan. at 36. Significantly, however, the court sided with those jurisdictions which have concluded that such threats do not render a confession involuntary per se, but rather such threats are only "one factor to be considered in the totality of the circumstances." 279 Kan. at 37.

Applying the totality of the circumstances test in *Swanigan*, this court found the defendant's confession involuntary. 279 Kan. at 39. The specific factors the court relied on in reaching this conclusion included: (1) the law enforcement officers' repeated use of false information and evidence, (2) the combination of the tactics used by law enforcement, including threats to convey Swanigan's lack of cooperation to the county attorney and threatening to charge him with additional robberies unless he confessed, and (3) evidence of the defendant's low intellect and his susceptibility to anxiety. 279 Kan. at 37-39. However, the *Swanigan* court expressly noted that "any one of these factors," when considered alone, might not be sufficient to show coercion. Rather, the combination of all of these factors led the court to find the statement involuntary. 279 Kan. at 39.

Ultimately, this court in *Swanigan* reversed the trial court's denial of the defendant's suppression motion, finding the failure to suppress the defendant's confession prejudiced the defendant because the State's case relied primarily on that confession. See 279 Kan. at 45-46. Near the end of the opinion, we reiterated that no one circumstance rendered the confession involuntary, and we cautioned that "a broad reading of our opinion today is expressly discouraged." 279 Kan. at 44.

Recently, in *Stone* we reaffirmed *Swanigan*'s strong admonition to consider the totality of circumstances in determining the voluntariness of a confession. In *Stone*, as in *Swanigan*, this court

reversed the trial court's denial of a motion to suppress statements made by the defendant in a custodial interview based upon the totality of the circumstances, including: (1) the defendant appeared exhausted during the interrogation, which began at 1 a.m., and several of his responses were garbled and disorganized; (2) the detective made misleading and ultimately untrue statements regarding finding the defendant's semen on the pajamas of the 9-year-old victim; (3) the detective implied that if the defendant told the truth, the length of his sentence could be affected; and (4) the detective said the defendant would be viewed as a sexual predator unless he confessed. See *Stone*, 291 Kan. at 22-33.

Here, in arguing his statements were involuntary, Robinson relies almost solely on statements made by the detectives in his interrogation. Specifically, he focuses on the officers' suggestions implying that if he told the truth, he could avoid the death penalty and decision makers would view him in a more favorable light.

The trial court, which heard the testimony of the officers and watched the full video of Robinson's interview, concluded that while the detectives "played toward Mr. Robinson's emotions" to elicit information and persuade him to tell the truth, they did not induce any false statements through promises.

Arguably, the statements Robinson objects to here were implied offers to convey his cooperation to the prosecutor, rather than threats to convey his lack of cooperation. As discussed above, only the latter implicate the defendant's right to remain silent.

Nevertheless, even if we disagreed with the trial court's characterization and ruling regarding the propriety of these statements, that conclusion would not require suppression of Robinson's statements. Instead, *Swanigan* and *Stone* dictate that a law officer's threat to convey a defendant's lack of cooperation, while inconsistent with the defendant's right to remain silent, does not render a confession involuntary per se. Rather, such threats are only "one factor to be considered in the totality of the circumstances." *Swanigan*, 279 Kan. at 37.

Here, while detectives repeatedly confronted Robinson with the evidence, there is no suggestion that they lied about the evidence during any point in the interview, as did the officers in *Swanigan*.

And although Robinson indicated during the interview that he was "tired" and could not "keep [his] head up," it is clear from the transcript and recording of the interview that Robinson responded appropriately and coherently to questions asked, and he did not appear to be overly tired or under the influence of drugs or alcohol.

Nor is there any evidence suggesting Robinson had a low intellect or was susceptible to anxiety like the defendant in *Swanigan*. Instead, the trial court found Robinson had above average intelligence and responded articulately to questions. And nothing in the record suggests the duration of the interview was excessive or that Robinson was denied any request to communicate with the outside world or to eat, drink, or use the bathroom during the course of the interview.

Significantly, Robinson's own testimony at the suppression hearing supports the voluntariness of his statements. Robinson not only testified that he understood and waived his *Miranda* rights, but that the *Miranda* rights had been read to him on five prior occasions. Robinson told the court that based on his past experience, he knew he could stop the questioning at any time.

Further, Robinson testified at the suppression hearing that he was able to think for himself during the interview and that while he understood that detectives wanted him to admit that he hired Gentry and Burnett to kill C.B., he never admitted any of those facts. Moreover, Robinson specifically agreed with the prosecutor's statement that Robinson was "not so overwrought or pushed around by Detective Gilmore to admit the things [Gilmore] wanted [him] to say."

Under the totality of the circumstances, we conclude the trial court did not err in finding Robinson's statements to detectives were voluntary, and we affirm the trial court's denial of Robinson's motion to suppress his statements.

*The trial court correctly admitted C.B.'s hearsay statements, although for the wrong reason.*

Robinson next contends the district court erred in finding that several hearsay statements C.B. made to her friends were admissible under the forfeiture by wrongdoing exception to the Con-

frontation Clause of the Sixth Amendment to the United States Constitution.

Before trial, the State moved to determine the admissibility of hearsay statements C.B. made to her friends in the months preceding her murder regarding her relationship with Robinson and statements she made in the days leading up to her murder regarding her plans to meet with Robinson. The State argued C.B.'s statements were nontestimonial and admissible under both the forfeiture by wrongdoing exception to the right of confrontation and K.S.A. 60-460(d)(3). At the motion hearing, defense counsel agreed the statements were nontestimonial but asserted Robinson's "right to confrontation and . . . his right to object to any hearsay statements the State plans to offer."

The trial court admitted the statements under the forfeiture by wrongdoing exception, citing *Giles v. California*, 554 U.S. 353, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008). The court found the evidence presented at the preliminary hearing was sufficient to establish by a preponderance of the evidence that Robinson procured C.B.'s absence in order to prevent her from being a witness against him regarding the potential rape charge.

Robinson renewed his objection to the admission of C.B.'s hearsay statements at trial, arguing the evidence did not support application of the forfeiture by wrongdoing exception. The trial court reaffirmed its prior ruling and granted Robinson a continuing objection. As a result, the trial court permitted the State to introduce (1) C.B.'s statements to her friend A.K. that C.B. had sexual intercourse with Robinson when C.B. was age 13, as well as on other occasions after her 14th birthday; (2) C.B.'s statements to A.K. regarding her plans to meet Robinson on the Friday of her death; (3) messages between C.B. and Robinson leading up to her death; and (4) C.B.'s text messages to, and conversations with, A.K. and M.D. indicating she left the skating rink with Gentry and that she expected him to take her to meet Robinson.

After the State rested, Robinson unsuccessfully moved to strike all of C.B.'s hearsay statements, again arguing the evidence did not support application of the forfeiture by wrongdoing exception.

*The trial court erred in applying the forfeiture by wrongdoing exception.*

On appeal, Robinson concedes C.B.'s statements were nontestimonial but argues the trial court erred in admitting the hearsay statements because K.S.A. 60-460 contains no hearsay exception based on forfeiture by wrongdoing. Alternatively, Robinson argues the exception does not apply because the evidence does not support the trial court's finding that Robinson killed C.B. with the intent to prevent her from being a witness against him.

Preliminarily, the State contends Robinson did not properly preserve this issue for appeal because Robinson did not object at trial on the ground that Kansas does not recognize a statutory hearsay exception for forfeiture by wrongdoing. Instead, he argued only that the exception did not apply based on the evidence in this case. Alternatively, the State contends the evidence supports the trial court's application of the forfeiture by wrongdoing exception and the trial court properly found that by making C.B. unavailable, Robinson waived all hearsay objections to the admission of C.B.'s statements. Finally, the State urges us to uphold the trial court's ruling as "right for the wrong reason," because C.B.'s hearsay statements were admissible under K.S.A. 60-460(d)(3).

When reviewing a trial court's decision to admit evidence, we first determine whether the evidence is relevant. See K.S.A. 60-401(b); K.S.A. 60-407(b); *State v. Riojas*, 288 Kan. 379, 382, 204 P.3d 578 (2009). Once relevance is established, our standard of review depends upon which rule the trial court applied to determine the admissibility of the evidence at issue. 288 Kan. at 383.

Ordinarily, we review the admission of hearsay evidence for an abuse of discretion. *State v. Miller*, 284 Kan. 682, 708, 163 P.3d 267 (2007). However, the issue of whether the trial court complied with specific statutory requirements for admitting evidence requires statutory interpretation, which we review de novo. *State v. Gonzalez*, 282 Kan. 73, 80, 145 P.3d 18 (2006). Similarly, we review de novo whether an evidentiary ruling violated a defendant's constitutional rights. See *State v. White*, 279 Kan. 326, 332-33, 109 P.3d 1199 (2005).

Hearsay is defined by statute as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 60-460. The admissibility of hearsay is governed either by the federal and state Constitutions or by statute, depending on the type of hearsay at issue.

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him or her. The Kansas Constitution Bill of Rights also protects a criminal defendant's right to confront the witnesses against him or her. The Confrontation Clause only bars admission of testimonial hearsay. *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). If a hearsay statement is found to be testimonial, it must be excluded unless a court finds that the declarant is unavailable as a witness and that the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 1777 (2004); *State v. Davis*, 283 Kan. 569, 575, 158 P.3d 317 (2007).

Additionally, even if a defendant had no prior opportunity to cross-examine the declarant, testimonial hearsay may be admitted under the forfeiture by wrongdoing exception if the court finds, by a preponderance of the evidence, that the defendant procured that declarant's absence with the intent to prevent the declarant from testifying against the defendant. See *Giles*, 554 U.S. at 361-69; *State v. Jones*, 287 Kan. 559, 567-69, 197 P.3d 815 (2008).

However, if a hearsay statement is nontestimonial, it "does not implicate the Confrontation Clause, and the only consideration before the court is whether it may be admitted under one of the statutory exceptions to Kansas hearsay law." *Davis*, 283 Kan. at 575.

Here, both parties agree that the challenged statements were nontestimonial. Because the statements were nontestimonial and the Confrontation Clause was not implicated, the trial court erred in admitting the statements under the forfeiture by wrongdoing exception to the Confrontation Clause. Instead, the court should

have considered whether the statements were admissible under any of the statutory hearsay exceptions found in K.S.A. 60-460. See *Davis*, 283 Kan. at 575.

*C.B.'s hearsay statements were admissible under K.S.A. 60-460(d)(3).*

As noted above, Robinson argues on appeal that K.S.A. 60-460 does not contain an exception for forfeiture by wrongdoing. The State argues Robinson failed to properly preserve this ground for objection by failing to raise it below. But we need not resolve these arguments. Instead, we may resolve the issue presented based on the State's argument to the trial court—an argument it maintains on appeal—that C.B.'s hearsay statements were admissible under K.S.A. 60-460(d)(3).

Even though the trial court did not consider this exception, we may do so. And if we determine C.B.'s hearsay statements were admissible under K.S.A. 60-460(d)(3), we can affirm the trial court's ruling as correct for the wrong reason. See *State v. Vasquez*, 287 Kan. 40, 58-59, 194 P.3d 563 (2008) (holding victim's nontestimonial hearsay statements were admissible under 60-460[d][3] and declining to address trial court's admission of the statements under the forfeiture by wrongdoing exception).

A hearsay statement is admissible under K.S.A. 60-460(d)(3) if the trial court finds: (1) the declarant is unavailable as a witness, (2) the statement was made "by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear," and (3) the statement "was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort." K.S.A. 60-460(d)(3).

Here, C.B. clearly was unavailable as a witness, and we must determine only whether C.B. made the challenged statements (1) at a time when she recently had perceived the matter about which the statements were made and while her recollection was clear, and (2) in good faith prior to the commencement of the action and with no incentive to falsify or distort.

Regarding C.B.'s statements to A.K. about the nature of her relationship with Robinson, A.K. testified that when she and C.B.

were both 13 years old, she was at C.B.'s home one afternoon when she and C.B. went for a walk. While on their walk, Robinson picked them up a few blocks from C.B.'s house and drove them to an apartment. A.K. stayed in the car while C.B. and Robinson went inside. After C.B. and Robinson returned to the car, Robinson drove the girls back to where he picked them up and the girls walked back to C.B.'s home. There, C.B. told A.K. she had sexual intercourse with Robinson at the apartment. Also, as C.B. changed clothes, she showed A.K. the panties she had been wearing and said that Robinson's sperm was on her panties. A.K. also testified C.B. later told her about subsequent sexual encounters with Robinson.

C.B.'s statements to A.K. about her sexual encounter with Robinson at the apartment were made immediately after the encounter at a time when her recollection was clear. And there is no suggestion that C.B.'s statements were not made in good faith or were made with an incentive to falsify or distort. Thus, C.B.'s statements about her sexual encounters with Robinson before she turned 14 were admissible under K.S.A. 60-460(d)(3).

A.K.'s testimony is unclear as to whether C.B.'s reports of later sexual encounters with Robinson were made at or near the time of the encounters. Nevertheless, any error in admitting these statements was harmless in light of Robinson's concession he had sex with C.B. on multiple occasions after she turned 14.

Regarding C.B.'s statements about her plans to meet Robinson, A.K. testified that when she and C.B. were together on the Wednesday before C.B.'s murder, A.K. saw C.B. instant messaging with Robinson about meeting him on Thursday. C.B. later told A.K. she did not meet with Robinson on Thursday, but that she had made plans to meet with him on Friday.

C.B.'s statements to A.K. regarding her plans to meet Robinson were admissible under K.S.A. 60-460(d)(3) because C.B. made the statements at a time when she had recently perceived the events about which the statements were made and while her recollection was clear. Again, we find no evidence suggesting C.B. made these statements in bad faith or with an incentive to falsify or distort.

Robinson also generally challenges as hearsay "[a]lleged messages between C.B. and [Robinson] leading up to her death," but he fails to identify the specific statements he challenges. We will not speculate as to the statements Robinson seeks to challenge. See *State v. Bryant*, 285 Kan. 970, 977-78, 179 P.3d 1122 (2008) (appellate courts may decline to address alleged errors when the appellant fails to specify which facts or statements support the alleged error).

Finally, we find that C.B.'s statements to A.K. and M.D., whether made verbally or via text message, about her plans to meet with Robinson and about leaving the skating rink with Gentry, were statements made about the events immediately preceding her death as those events were occurring and also are admissible under K.S.A. 60-460(d)(3).

Because the challenged statements were all admissible under K.S.A. 60-460(d)(3), the district court did not err in denying Robinson's motion to suppress C.B.'s statements, and we affirm the trial court's decision as correct for the wrong reason.

*The trial court did not abuse its discretion in admitting photographs of C.B.'s body and grave.*

Robinson argues the trial court abused its discretion in admitting gruesome and repetitious photographs of C.B.'s body after it was found in the shallow grave. And, as evidence that he was prejudiced by this error, Robinson points out that several jurors emotionally reacted to the photographs. The State argues that because the photographs were relevant to establish the violent nature of the crime and to corroborate witness' testimony, the trial court did not abuse its discretion in admitting the photographs.

In reviewing the admission of photographic evidence, we first determine whether the photographs are relevant. We review claims that photographs were overly repetitious, gruesome, or inflammatory for abuse of discretion. *Riojas*, 288 Kan. at 387.

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial

competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011) (citing *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 [2010]).

The party asserting an abuse of discretion bears the burden of showing such an abuse of discretion. See *State v. Woodward*, 288 Kan. 297, 299, 202 P.3d 15 (2009).

Robinson challenges the admission of 17 crime-scene photographs. Twelve of those photographs—Exhibits 120-131—depicted C.B.'s body as it was found in the shallow grave and as it was exhumed. The remaining five photographs—Exhibits 134-138—depicted C.B.'s body after it was exhumed, focusing primarily on the Playstation cord tied around her neck.

Before admitting the photographs, the district court conducted a hearing outside the presence of the jury. At the hearing, Robinson objected to the photographs as duplicative, repetitious, gruesome, and more prejudicial than probative. The trial court agreed that many of the photographs were gruesome and pointed out that the photographs—like most evidence in a criminal prosecution—prejudiced the defendant. The trial court admitted the photographs, however, after concluding the photographs were relevant to show the manner of death and were more probative than prejudicial.

Robinson contemporaneously objected to the admission of the photographs, preserving this issue for appeal. Further, after the court had admitted a majority of the photographs, defense counsel noted for the record that several jurors were either weeping or crying during the State's presentation of the photographs. The court agreed that it had observed some weeping in the courtroom but found that reaction was not inappropriate considering the nature of the photographs.

As noted, our first task is to determine whether the photographs were relevant. See K.S.A. 60-401(b); *Riojas*, 288 Kan. at 387. All relevant evidence is admissible under K.S.A. 60-407(f) unless it is otherwise precluded by statute, constitutional provision, or court decision. *State v. Baker*, 287 Kan. 345, 363, 197 P.3d 421 (2008).

We have applied some general principles when considering the relevancy of photographs in a homicide case. For instance, pho-

tographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case, as are photographs which materially assist the jury's understanding of medical testimony. Specifically, photographs which aid a pathologist in explaining the cause of death are admissible. *State v. Parker*, 277 Kan. 838, 847, 89 P.3d 622 (2004).

Additionally, because the State has the burden to prove every element of the crime charged, photographs may be relevant to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, even if the cause of death is not contested. *Riojas*, 288 Kan. at 387. While we have stated that the " 'wholesale admission of similar grotesque and bloody photographs which add nothing new to the state's case' " is improper, a photograph need not be excluded simply because it is gruesome. *State v. Hernandez*, 284 Kan. 74, 99, 159 P.3d 950, *cert. denied* 552 U.S. 1025 (2007) (quoting *State v. Clark*, 218 Kan. 18, 24, 542 P.2d 291 [1975]). Finally, photographs may be relevant to corroborate other evidence. *Baker*, 287 Kan. at 364-65.

Here, the State introduced the challenged photographs through Butler County Sheriff's Detective Kelly Herzet, who was present as C.B.'s body was exhumed. Herzet testified that just before the body was exhumed, he received a call from Detective Kent Bauman regarding C.B.'s missing person case. Bauman told Herzet that C.B. was last seen wearing white flip-flops. According to Herzet, as C.B.'s body was then exhumed, officers discovered a white flip-flop, which appeared to have been "tossed in on the west side of the body after [it was] put in the grave." Herzet identified Exhibit 120 as a photograph of the flip-flop as it was discovered. Further, Herzet testified that Exhibits 121 and 122 showed the progression of the excavation and the discovery of the second flip-flop.

Additionally, Herzet testified that Exhibits 123-131 demonstrated the progression of the excavation of the burial site from various angles, the discovery of a cord and plastic bags tied around C.B.'s neck, and the depth of the grave. Exhibits 132-138 depicted C.B.'s body after it was exhumed and provided closer views of the

plastic bags over C.B.'s head and the Playstation cord tied at the back of her neck.

In addition to establishing the manner and circumstances of C.B.'s death, the photographs clearly corroborated several aspects of Gentry's testimony, including (1) the digging of a shallow grave on the day of the murder; (2) the purchasing of items at Walgreens on the night of the murder; (3) the use of a VCR or TV-type cord to strangle C.B. from behind; (4) the placement of a plastic Walgreens bag over C.B.'s head; (5) the placement of C.B.'s body face down in the grave; and (6) the tossing of C.B.'s flip-flop sandals into the grave after placing her body in the grave.

We agree with the trial court that while the photographs may have been gruesome, and a few repetitious, the photographs nevertheless were relevant and admissible to demonstrate the manner and violent nature of C.B.'s murder and to corroborate Gentry's testimony regarding several details of the murder. And while the record demonstrates that the photographs elicited emotional responses from some jurors, that fact does not change our assessment of the relevancy and admissibility of the photographs. The trial court did not abuse its discretion in admitting the photographs.

*The district court did not err in denying Robinson's motion for a new judge.*

Robinson next claims the district court's denial of his motion for a change of trial judge violated his right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution. Robinson argues that his affidavit in support of his motion established that the trial judge had an appearance of bias, while the trial judge's erroneous ruling permitting the admission of gruesome and repetitious photographs established actual bias. The State contends Robinson's affidavit was insufficient to establish that the trial court had a duty to recuse. And because the trial court correctly admitted the photographs, the State contends Robinson has not established actual bias.

We review de novo whether a trial court's ruling violated a criminal defendant's right to due process. *State v. Hall*, 287 Kan. 139, 143, 195 P.3d 220 (2008).

Nearly a year before the jury trial, Robinson sought a change of the trial judge, District Judge Benjamin Burgess, pursuant to K.S.A. 20-311d(a), generally asserting the trial judge could not provide him with a fair trial. After the trial judge denied his request, Robinson filed an affidavit in support of his motion pursuant to K.S.A. 20-311d(b) and (c), identifying six instances in which the trial judge allegedly demonstrated "personal bias and prejudice." Robinson generally argued his concerns fell squarely within K.S.A. 20-311d(c)(5), which provides, in relevant part, that a party may have grounds to support a motion for a new judge when "[t]he party or the party's attorney filing the affidavit has cause to believe and does believe that on account of the personal bias, prejudice or interest of the judge such party cannot obtain a fair and impartial trial."

Pursuant to K.S.A. 20-311d(b), District Chief Judge Michael Corrigan heard oral arguments on Robinson's motion for a change of judge before denying the motion. The chief judge concluded that a reasonable person with knowledge of the relevant circumstances would determine that the defendant could obtain a fair and impartial trial from the trial judge. Further, the chief judge found Robinson's affidavit in support of his motion alleged legally insufficient grounds to change the assigned trial judge.

In the past, when a district judge has refused to recuse based upon the defendant's request, this court has applied a two-part test to determine whether the defendant received a fair trial or whether the defendant's due process rights were violated by that refusal. First, we considered whether the trial judge had a duty to recuse from the case because the judge was biased, prejudiced, or partial. If so, we considered whether the trial judge's failure to recuse resulted in actual bias or prejudice warranting setting aside the judgment of the trial court. See *State v. Sappington*, 285 Kan. 176, 190, 169 P.3d 1107 (2007).

More recently, in the civil context, we clarified that the second part of the two-part test does not always require a showing of actual bias to prove a due process violation. *Davenport Pastures v. Board of Morris County Comm'rs*, 291 Kan. 132, 144-46, 238 P.3d 731 (2010). Instead, "due process is violated when, under all the cir-

cumstances of the case, the 'probable risk of actual bias [is] too high to be constitutionally tolerable.' " 291 Kan. at 146 (quoting *Withrow v. Larking*, 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 [1975]).

Although we have not yet applied this clarification of the two-part judicial bias test in the criminal context, we see no valid reason to apply a different standard in the criminal context where the same due process considerations exist. Thus, when a criminal defendant alleges judicial bias, we restate our test as follows: First, the defendant must show that the trial judge has a duty to recuse. Second, the defendant must show actual bias or prejudice that warrants setting aside the conviction or sentence. But bias or prejudice will be presumed when, based on objective standards, the probability of actual bias is too high to be constitutionally tolerable.

### *The trial judge did not have a duty to recuse.*

Applying the first prong of the test here, we note that a judge has a duty to recuse from any case "in which the judge's *impartiality* might reasonably be questioned, including . . . : (1) The judge has a personal bias or prejudice concerning a party." Supreme Court Rule 601B, Kansas Code of Judicial Conduct, Canon 2, Rule 2.11(A)(1) (2011 Kan. Ct. R. Annot. 699).

When reviewing the legal sufficiency of an affidavit in support of a motion for a change of judge, we have unlimited review, and on appeal must decide the sufficiency of the affidavit and not the truth of the facts alleged. We must

"examine whether the affidavit provides facts and reasons pertaining to the party or his or her attorney which, if true, give fair support for a well-grounded belief that he or she will not obtain a fair trial. [Citation omitted.] We determine whether the charges are grounded in facts that would create reasonable doubt concerning the court's impartiality, not in the mind of the court itself, or even necessarily in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances. [Citation omitted.]" *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 385, 22 P.3d 124 (2001).

In his appeal brief, Robinson refers to only three of the six allegations he asserted in his affidavit and claims these allegations were sufficient to establish the appearance of bias creating a duty

to recuse. The first instance occurred during a hearing on Robinson's motion for new counsel when the trial judge stated:

"I certainly understand all the ramifications and implications of the motion and the effect it has on others in that regard. I would just make an observation of the fact as a former member of the Kansas Parole Board I dealt with many, many family members of murder victims. The human being in me is very empathetic in that regard and I note [C.B.'s mother] is in the courtroom this morning. However, as a judge you set that [aside] and you take a very objective approach and deal with the issues objectively and honestly in the forth rightness [*sic*]."

Robinson contends the trial judge's statement regarding his past membership on the parole board and his empathy for victims established the judge's personal bias and prejudice toward Robinson. But Robinson fails to discuss the context in which the statements were made.

Earlier in the hearing on Robinson's motion for appointment of new counsel, the trial judge acknowledged that Robinson was charged with capital murder and stated that the court would review the motion "with the highest level of scrutiny" and "do everything in [its] power" to provide Robinson a fair trial. Later in the hearing, the trial judge advised Robinson that if the court granted his motion for new counsel, the trial likely would be delayed. Further, the judge explained that the delay would be charged to Robinson for speedy trial purposes and Robinson would remain in custody during the delay.

In ruling on Robinson's request for appointment of new counsel, the trial judge noted that it had no reason to believe that defense counsel had not acted in a "forth right [*sic*], candid and honest" manner. Nevertheless, the judge again emphasized that Robinson faced a capital murder charge, and therefore the court concluded it would err on the side of caution and permit defense counsel to withdraw. The court then appointed new counsel per Robinson's request.

We do not condone the trial judge's statements regarding his former membership on the parole board, and we expressly discourage judges from referencing their personal background or experiences when ruling on matters before them. That said, it is clear that when read in context, the trial court's superfluous statements

were not sufficient to establish personal bias or prejudice against Robinson. Instead, the trial judge's comment about being "empathetic" was aimed at explaining to the victim's family that the court understood how the family might view the delay caused by the court's decision to grant Robinson's motion for new counsel.

As an additional ground supporting his motion, Robinson points out that in a written response to a letter from Robinson expressing concerns about the judge's ability to provide a fair trial, the trial judge said:

"As to the issue you raise, I simply point out that one thing many members of the general public do not fully understand is that lawyers, and judges alike, are often required to set aside their own personal views to properly deal with issues they're presented. In my experience both lawyers and judges do this and, yet, still remain true to the task undertaken."

We do not agree with Robinson's claim that these statements reflect the trial judge's bias and prejudice toward Robinson. Instead, the statements reiterate the trial judge's lack of bias as well as his understanding of a judge's obligation to set aside any personal views.

Finally, as further evidence of the trial judge's bias, Robinson points to the following statements made by the trial judge during a motion hearing on the admissibility of antemortem photographs:

"Well, I am aware of the heightened degree or level of scrutiny that is utilized by appellate courts in examining issues in capital cases. . . . The rules of admissibility of exhibits remain the same. . . . If the State's theory is believed by the jury they could conclude that Mr. Robinson set into motion the chain of events that led to [C.B.'s] death. Accordingly, all those events up to and including her death are relevant evidence to be admitted in the case.

. . . .

"As counsel on both sides know in my prior experience I served several years as assistant U.S. attorney and U.S. attorney. Frankly, I was on one or two occasions accused of, quote, overkill, unquote, in regard to the submission of evidence to a jury, and my argument always was that I as a prosecutor had the burden of proof beyond a reasonable doubt, which is the highest legal standard, . . . so as a prosecutor having that burden you do try to put in everything that could possibly be used to persuade the jury that your proof is sufficient beyond a reasonable doubt. And these photographs are no different. . . . But, again, without in the context of the trial itself seeing the photographs, I will not make any advance ruling as to this issue, and accordingly, for the purpose of deciding this particular issue, I'll

just simply deny it for the reasons that I have stated on the record subject to further scrutiny during the course of trial."

Again, the trial judge's references to his former prosecutorial career were unnecessary, and the comments may have been perceived by Robinson as an indication of bias in favor of the prosecution. But we do not apply a subjective standard in considering a judge's duty to recuse. Instead, the facts alleged in an affidavit to support a request for a new trial judge must be "facts that would create reasonable doubt concerning the court's impartiality . . . in the mind of a reasonable person with knowledge of all the circumstances." *Meneley*, 271 Kan. at 385.

When taken in context and considered objectively, it is clear the trial judge individually and thoroughly assessed the motion. Further, the court correctly recognized that in a death penalty case, the rules of evidence are not altered, even though the appellate court applies a higher degree of scrutiny.

Under the circumstances presented here, the chief judge did not err in concluding that Robinson's allegations were legally insufficient to create a reasonable doubt in the mind of a reasonable person concerning the trial judge's impartiality. Thus, the trial judge had no duty to recuse, and we affirm the denial of Robinson's motion for a new trial judge.

*The trial court did not erroneously instruct the jury on the State's burden of proof.*

Next, Robinson claims the trial court erred when it instructed the jury as follows:

"Ordinarily, a person intends all of the usual consequences of his or her voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

See PIK Crim. 3d 54.01.

Robinson argues this instruction permitted the jury to disregard the burden of proof instruction on the element of intent, effectively relieving the State of its burden to prove intent and shifting that burden to defendant.

As the State points out, Robinson's general objection at trial—"[W]e don't believe [PIK Crim. 3d 54.01] needs to be given in this case"— did not distinctly state the grounds for the objection as required by K.S.A. 22-3414(3) and failed to encompass the arguments Robinson now raises on appeal. Thus, we apply a clearly erroneous standard of review. See *State v. Ellmaker*, 289 Kan. 1132, 1138-39, 221 P.3d 1105 (2009), *cert. denied* 130 S. Ct. 3410 (2010) (clearly erroneous standard applies when party objects to instruction at trial on one ground but asserts a different ground on appeal).

"An instruction is clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *State v. Martinez*, 288 Kan. 443, 451-52, 204 P.3d 601 (2009).

As Robinson concedes, in *State v. Stone*, 253 Kan. 105, 107, 853 P.2d 662 (1993), we approved the same instruction challenged here. There, the defendant argued the instruction violated his constitutional right to due process because it "relieved the State from proving the intent-to-kill element of second-degree murder." 253 Kan. at 106. We disagreed, concluding the instruction "clearly states the burden of proof never shifts to the defendant" and "creat[es] a permissible inference of intent rather than an improper rebuttable presumption." 253 Kan. at 107; see also *Martinez*, 288 Kan. 451-52 (finding that instruction containing same language Robinson objects to here was not clearly erroneous when it specifically informed the jury it was never to shift the burden of proof to the defendant).

Similarly, in this case the challenged instruction specifically stated that the burden of proof never shifted to the defendant. Under these circumstances, we conclude the instruction was not clearly erroneous.

*Robinson is not entitled to be resentenced under the identical offense doctrine.*

Finally, Robinson claims the identical offense doctrine requires that he be resentenced for his capital murder conviction in accordance with the lesser penalty applicable to the crime of first-

degree premeditated murder because "the elements of aiding and abetting first-degree premeditated murder, and capital murder by murder for hire, are effectively identical."

The State argues Robinson's claim is flawed because he compares one criminal offense—capital murder—to a principle of criminal liability—aiding and abetting—rather than comparing the elements of two criminal offenses as required for application of the doctrine.

We review de novo whether the identical offense doctrine applies in a given case. *State v. Sandberg*, 290 Kan. 980, 984, 235 P.3d 476 (2010).

Under the identical offense doctrine, "if two criminal offenses have identical elements but different penalty classifications, a defendant convicted of either crime may be sentenced only under the lesser penalty provision." 290 Kan. at 982. The doctrine applies only when two separate criminal offenses are compared. 290 Kan. at 985.

Here, the State charged Robinson with capital murder in violation of K.S.A. 21-3439(a)(2) which proscribes the "intentional and premeditated killing of any person pursuant to a contract or agreement to kill such person or being a party to the contract or agreement pursuant to which such person is killed." Thus, on a charge of capital murder under subsection (a)(2) the State ordinarily is required to prove the defendant (1) intentionally killed another person, (2) with premeditation, (3) pursuant to a contract or an agreement to kill such person. But if the defendant was not the person who committed the act of killing another, the State is required to prove (1) the victim was intentionally killed, (2) the killing was premeditated, (3) the killing was done pursuant to a contract or agreement, and (4) the defendant was a party to the contract or agreement. See K.S.A. 21-3439(a)(2); PIK Crim. 3d 56.00-A, Notes on Use ("In the case of murder for hire, any party to the contract or agreement is guilty of capital murder.").

Robinson identifies the purported identical offense in this case as first-degree murder in violation of K.S.A. 21-3401(a) under a theory of aiding and abetting. K.S.A. 21-3205(1) provides that "[a] person is criminally responsible for a crime committed by another

if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." But aiding and abetting is not a separate crime in Kansas. Instead, it extends criminal liability to a person other than the principal actor. See *State v. Spangler*, 38 Kan. App. 2d 817, 830, 173 P.3d 656 (2007).

Despite the specific language used in K.S.A. 21-3205(1), when a defendant is prosecuted under the theory of aiding and abetting the State is not required to prove the defendant actually "hired" or "procured" another to commit the crime. Instead, "to establish guilt on the basis of aiding and abetting, the State is required to show that a defendant knowingly associated with the unlawful venture and participated in such a way as to indicate that [the defendant] was facilitating the success of the venture." *Baker*, 287 Kan. at 366.

Accordingly, to obtain a conviction for first-degree murder under the theory that the defendant aided and abetted the murder, the State is required to prove (1) the victim was intentionally killed, (2) the killing was premeditated, and (3) the defendant "knowingly associated with" the killing "and participated in such a way as to indicate that [the defendant] was facilitating the success of" the killing. See K.S.A. 21-3401(a); K.S.A. 21-3205(1); *Baker*, 287 Kan. at 366; PIK Crim. 3d 56.01. These elements are not identical to the elements of the charged crime of capital murder based on a murder-for-hire theory. See K.S.A. 21-3439(a)(2). Thus, Robinson is not entitled to resentencing under the identical offense doctrine.

Affirmed.