NOT DESIGNATED FOR PUBLICATION

No. 115,690

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of

M.A.E., YOB 2002;
M.A.E., YOB 2003;
B.A.B., YOB 2007;
M.B., YOB 2011;
B.A.B., YOB 2013; and
R.L.B., YOB 2014.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN L. SLOAN, judge. Opinion filed February 10, 2017. Affirmed.

*Catherine A. Zigtema*, of Zigtema Law Office LC, of Shawnee, for appellant natural mother.

*Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON and MALONE, JJ.

*Per Curiam*: Mother's parental rights were terminated to her six children after a trial at the district court. On appeal, Mother argues: (1) she was denied due process when the district court judge failed to recuse herself after receiving an ex parte communication from a detective regarding an incident that occurred in the case; (2) she was denied due process because of ineffective assistance of counsel; and (3) there was insufficient evidence to find that the conditions that made her unfit to parent her six children were unlikely to change in the foreseeable future.

1

We affirm the district court's findings because the judge was not biased by the ex parte communication and did not have to *sua sponte* recuse herself, therefore Mother was not denied due process. Mother's counsel was not ineffective and she was not denied due process. There was clear and convincing evidence that Mother had a pattern of conduct over a period of nearly 3 years that was unlikely to change in the foreseeable future.

Mother is the mother of Ma.E (born 2002), Me.E. (born 2003), Bri.B. (born 2007), M.B. (born 2011), Bro.B. (born 2013), and R.L.B. (born 2014.) Father is the father of Bri.B., M.B., Bro.B., and R.L.B. M.L., also known as M.E., is the father of Ma.E. and Me.E. M.E. was never involved in his children's case and is incarcerated in Florida. Mother (G.S.) and Father (B.B.) were married in February 2013. Mother appeals from the termination of her parental rights for all of the children.

The first report concerning the children came to the Kansas Department for Children and Families (DCF) on August 17, 2004. It was an assessment of concerns about the lack of supervision and physical abuse. It was reported that Ma.E. had been found by the Kansas City Police Department wandering the streets for at least 45 minutes. Mother and maternal grandmother were listed as the alleged perpetrators. Services were offered but refused by the family.

A second report came to DCF on May 20, 2009. It was alleged that Father had hit Me.E. with a belt, causing a red mark around her left arm. Also, the house did not have electricity.

The child in need of care (CINC) petition also stated that the Missouri Department of Social Services had received reports for the family on November 22, 2009, and January 13, 2010. Assessments were completed but the reports were not released from Missouri.

On November 27, 2012, DCF social work specialist, Katie Olivas, was assigned to investigate the children the first time. The report was a nonabuse/nonneglect, without proper care or control, against Mother. Mother was 8 months pregnant with Bro.B. and had been using hydrocodone and oxycodone during her pregnancy. Mother told Olivas she began using hydrocodone and oxycodone in January 2012. More recently, she had been taking suboxone, which she got from a friend, and started using it when she was pregnant. She also reported she went to the methadone clinic at the University of Kansas Medical Center once a day. Olivas spoke with Father who said Mother had been hospitalized to get off painkillers prior to the report. He also reported Mother had used hydrocodone and sometimes Percocet for the past 8 months. Father stated he had a prescription for hydrocodone and used it as prescribed, but when it ran out he got it from the street.

Olivas received a second report on December 6, 2012, for lack of supervision. Mother was still pregnant with Bro.B. and it was reported that the other 4 children had been left alone at home on at least 2 occasions. On December 12, 2012, Olivas spoke to Mother who admitted to leaving the children alone at home to get cigarettes at the gas station. Olivas offered DCCCA Family Preservation services, but Mother refused after speaking to Father. Ultimately, they both agreed to services.

A third report was assigned to Olivas on April 5, 2013. There was an allegation of physical neglect of Bro.B., who was 12 weeks old. It was reported that he had a rash on his body and there was concern he needed medical attention. Olivas spoke with Bro.B.'s paternal stepgrandmother, and she reported that no one knew where Mother or Father were. Olivas received a phone call from the East Antioch Elementary School principal who told Olivas that Mother and Father had not picked up the children from school on April 4, 2013. Another family member had picked up the children and told her about Bro.B.'s rash.

Olivas observed the rash on Bro.B. Mother referred to it as a diaper rash. Olivas stated the rash appeared to be quite painful. It had an open and cracked wound with some powder in it that looked as though it had been there for quite some time. The rash was near his rectum on both sides of his cheeks. Mother reported she had applied Neosporin to the rash for about 1 1/2 weeks twice a day, and that Bro.B.'s skin had peeled because of the Neosporin. At this point, the family had not been working with DCCCA and Mother told Olivas the services were not what she thought and things were too hectic to continue working with the service at that point.

Olivas felt intervention was necessary after the third report because there were multiple concerns with drug use, the parents were not participating in services, and the parents showed a lack of responsibility and a lack of acknowledgement regarding the reported concerns. Olivas referred the case for the filing of CINC petitions with the district attorney's office on April 9, 2013. There was a temporary custody hearing that day and the children were placed in state custody and placed with their paternal grandfather and stepgrandmother, A.B. and J.B. Both Mother and Father took a drug test at the hearing that day. Father tested positive for benzodiazepines and amphetamines. He stated he had a prescription for the benzodiazepines. Mother tested positive for methamphetamine and said she had last used on April 5, 2013. Olivas substantiated the physical neglect report regarding Bro.B. on both parents and the substantiations were never appealed.

On May 8, 2013, both Mother and Father filed stipulations that the children were in need of care. The first reintegration plan was granted on June 25, 2013, and was from May 30, 2013 to November 30, 2013. The plan required, among other tasks, that the parents maintain employment to fulfill the family budget, participate in individual and family therapy, participate in outpatient drug and alcohol programs, participate appropriately during visitation, and resolve all legal issues.

On April 8, 2013, Mother expressed to Olivas that she and Father had been fighting a lot. When they fought, either she or Father left and stayed at a hotel.

On August 2, 2013, Olivas received a report of physical abuse by Father towards Bro.B. During a visit at the KVC office, it was determined that Bro.B. had a broken femur and was in Father's care at the time. Father reported that during the meeting, Bro.B was fussy. He asked the case manager if he could go change Bro.B.'s diaper. He stated he was gone for 3 minutes. Olivas stated the parents were agitated during the meeting because they had been told prior to the visit that they would no longer have weekend visits and all visits would have to be supervised and go through KVC. Bro.B. received medical attention for his broken leg. Father was substantiated for physical abuse and the substantiation was never appealed.

On September 5, 2013, partway through the first reintegration plan, Julie Williams took over as the case manager. On October 21, 2013, the State filed its first motion to terminate Mother's and Father's paternal rights. Williams opposed the motion and recommended that the parent's reintegration plan be extended. At the time, she felt she had not had enough time working with the family to make a proper determination as to what was in the children's best interests. She believed there had been a significant lack of services that needed to be initiated.

On February 24, 2014, the district court granted Mother and Father a second 90-day reintegration plan. Then, on February 26, 2014, 2 days after the beginning of the second reintegration plan, Olivas was assigned to a nonneglect/nonabuse report because Mother had given birth to a baby boy, R.L.B. Mother had not told anyone about her pregnancy. Mother acknowledged to Olivas that she had not told anyone she was pregnant because she and Father were afraid this child would also be removed. On March

5

6, 2014, the State filed a CINC petition for R.L.B. and he was subsequently taken into State custody.

By April 2014, Williams believed the parents had successfully completed a significant portion of their plan. There was an ongoing conversation about sending the children home by the end of the school year. At this time, the parents were allowed extended unsupervised visits with the children. Williams believed that if the parents were given more time the children could be reintegrated.

However, problems began popping up around this time as well. Both Mother and Father struggled with legal issues. The parents had been charged with theft in an incident where the children were involved. The parents continually minimized the situation. They said the children had been in the vehicle but they were not in the store. The parents did not understand what the big deal was. Mother had picked up another criminal charge.

The parents were required to take random drug tests and they struggled to follow through with those. Mother tested positive for amphetamine and methamphetamine on April 11, 2013, and then she missed 8 drug tests from June 2013 to August 2013.

Williams believed a domestic violence assessment was necessary for the parents because of concerns by the family therapist. The parents also continued to violate the safety plan that was put in place regarding visitation. Because of this, the children were emergency removed in early 2014 from the paternal grandparents. When Williams submitted her last report, Mother was on house arrest and Father was serving weekends in jail.

On May 15, 2014, Williams left KVC and her supervisor, Megan Drovetta, took over the case. At that time, the second reintegration plan was over and the State filed its second motion to terminate. The trial was set for October 2014 in order to give the

parents more time to work on the second reintegration plan. Drovetta's goal was to have the children reintegrated with the parents by September 2014.

However, during that summer, Mother and Father continued to minimize their problems and blame other individuals. They had not started couples counseling. There was also concern about the parents criminal history combined with their new charges, which was why the children had not been reintegrated over the summer.

In October 2014, Drovetta advocated for another 90 day extension of the second reintegration plan. On October 8, 2014, both Mother and Father stipulated to their unfitness and received a modified reintegration plan. This modified plan looked more at foreseeability and how to maintain stability. The plan went well from October 2014 to April 2015. In January 2015, Drovetta advocated for a 60-day extension of the reintegration plan. The court granted a 90 day extension that began in March 2015.

Drovetta began having concerns about substance abuse by the parents. Father tested positive for amphetamines on September 19, 2014, and did not provide a prescription. Drovetta wanted Mother to decrease her methadone dosage because she had been at 41 milligrams for a long time. Mother never provided proof that she had decreased her methadone treatments.

In April 2015, there were concerns that Mother and Father were fighting in front of the children during visits. The arguments upset the oldest child. KVC was concerned because of the prior domestic violence assessment recommendation and the effect their fights were having on the children.

Also in April 2015, Mother and Father indicated their van had been stolen. It was the third time the van had been stolen. KVC asked for the police report for the stolen van

but never received one. Then, Father had a blackout while driving and crashed their other car and had to go to KU Medical Center for testing.

The budget was also a concern. Their income was close to their expenses without the six children. Both parents had fines from their criminal charges. With the children included, their budget was in the negative.

There continued to be legal issues during the modified reintegration plan. Father was required to register as an offender, and he did not, which resulted in his probation being revoked and ultimately he had to spend 30 days in jail. Mother had a positive drug test and her probation was extended to October 2016. Her drug test was positive for amphetamine which she stated was from a diet pill she had taken from her friend. Mother had to serve 2 weekends in jail because of the positive drug test.

At one point during this modified plan, the parents were given weekend passes. However, these were reduced in June 2015, after there was concern the parents were not following through on expectations. There were also concerns from some of the foster mothers that the girls were not always at home with the parents during their weekend visits. It was discovered that the children were not always wearing seatbelts or sitting in proper car seats when with the parents. The children were returning to their foster homes hungry and not having completed the homework that was sent with them over the weekend. The parents had a difficult time getting the children to their extracurricular activities. Mother, Father, and the children were supposed to attend the KVC Halloween party on October 28, 2015, but the parents backed out at the last minute and the children attended without them.

In June 2015, KVC and other professionals held a framework meeting. There were several concerns that were discussed at this meeting. First, there was concern that shoplifting had become a replacement for addictive behaviors regarding drugs for

8

Mother. Another concern was the lack of transparency and honesty on the part of the parents. There was the van issue, issues with maintaining employment, and concerns with honesty. There was a lack of a transportation plan, a meal and bedtime schedule, an updated budget, and copies of bills had not been provided.

Drovetta also had other concerns. Mother may have told the girls that "what happens at the house stays at the house." The girls stated they had been told by their parents that since Bri.B was the first born they could favor him. There was an issue that Ma.E.'s bedroom light had been removed because she had forgotten to turn it off. There were concerns that the girls said they were nervous when they went home. They were afraid to say things in family counseling and stayed in their rooms most of the weekend to escape being around the parents so they did not get into trouble.

Through the framework meeting, KVC identified 19 steps for Mother and Father They needed KVC to follow up with probation officers regarding drug tests and appointments, talk with their family therapist about their involvement in therapy, talk about maintaining sobriety, preventing future thefts, obtain a relapse prevention plan, obtain a firm plan for the two oldest children for summer childcare, obtain information about Father's blackout, have the parents clean up their home, create permanent sleeping areas and chore charts, obtain copies of bills and pay stubs, and, among other things, obtain the police report for the alleged stolen vehicle. A majority of these tasks were never completed.

There was some progress in the plan. Mother and Father maintained housing and Mother maintained employment. Mother was in therapy. There continued to be a bond between the parents and the children. There was a desire to reintegrate all of the children.

However, since the June 2015, meeting, KVC had a difficult time communicating with Mother and Father. Father was aggressive towards one of the social workers, Brandy

9

Perez. There was also continued concern about a lack of accountability. Father also sent You Tube videos about foster care being corrupt to KVC and to placement. In June, Mother violated the safety plan that was put in place for visitation. She went to the foster parent's church and made unauthorized contact with Bri.B.

Mother argues in her brief there was an ex parte communication between the district court judge and a detective. She alleges the communication biased the judge against the parents and, therefore, the judge should have recused herself. On October 21, 2013, there was a hearing on the motion to terminate. At the hearing, counsel for Mother stated, "We do have one issue that's been lingering in this case and that was an e-mail sent directly to the Court by the detective involving an incident about this case."

The email in question was sent by a detective to the district court judge. It described the incident where Father was substantiated for physical abuse against Bro.B. when his leg was broken. The judge shared the email with all the attorneys on the case the same day the email was sent, August 6, 2013.

Throughout the case, the district court judge made various comments about the incident where Father was substantiated for physical abuse against Bro.B. At a hearing on February 24, 2014, the judge asked what bone had been broken on Bro.B. The guardian ad litem told the judge it was his leg, and a scan had been done and there were additional fractures at different stages of healing. The judge responded, "Even better. Making me really feel good now." The judge then set the case over until April.

At the CINC hearing for R.L.B., the district court judge made another comment about the substantiation for physical abuse against Father. She stated, "You all know I have a hard time with this. Every time we come back to court I have a fit because of the substantiation. Never going to be able to explain this to me. I don't understand, I am concerned." The judge again set the case over for a review hearing to July 22, 2014.

10

At the termination hearing, Drovetta testified it was not in the children's best interest to continue with reintegration efforts. She testified that Mother and Father were not in a position to properly care for all six children. She stated there was a continued pattern of an inconsistent and chaotic lifestyle with the parents. They made short progress and then they made mistakes. It concerned her that the parents were not honest with professionals when something had happened. She believed the parents would never be able to reach a level of functionality to care for all six children. She felt the parents' behavior and lifestyle was not likely to change in the immediate or foreseeable future because of the patterns the parents fell into of having short term success and then making a mistake that sent them back to square one. Ultimately she believed it was in the children's best interests to have the parents' rights terminated and to reach permanency through adoption.

On February 23, 2016, the district court judge held a hearing where she ruled on the termination of parental rights trial. The judge characterized the course of the case and the progress, or lack thereof, of the parents as a "roller coaster." She found Mother and Father unfit pursuant to K.S.A. 2015 Supp. 38-2269(b)(7) due to "the extensive and significant and reasonable efforts made by KVC to rehabilitate the family and those efforts were unsuccessful." While she did acknowledge there had been some glitches with KVC along the way, those issues never rose to the level of a lack of reasonable efforts made by KVC.

The district court judge also stated the evidence was clear and convincing that Mother and Father were unfit pursuant to K.S.A. 2015 Supp. 38-2269(b)(8) "based on their lack of effort to adjust their circumstances, conduct, and conditions to meet the needs of the children." She described the parent's behavior as waves of progress, only to come crashing down and thwarting successful reintegration and permanency for the children. The judge noted that Father had been substantiated for Bro.B.'s broken leg and

11

both parents had a significant criminal history and continued to commit crimes. Both parents exhibited an overwhelming failure to maintain stability and to be honest. They lied about unauthorized visits with the children, completing marriage counseling, the pregnancy and birth of R.L.B., job loss, and the loss of their car. Ultimately, there had been almost 3 years of reintegration efforts only to have the parents continue to fail.

The district court found that Mother and Father's conditions were unlikely to change in the foreseeable future due to the exceptional amount of time they had to reintegrate with the children. There was a clear pattern and history of behavior even before these cases were filed to lead the court to make this conclusion. The court further found it was in the best interests of the children for the parental rights of Mother and Father to be terminated. The children had waited a long time and deserved permanency. The court granted the termination of their parental rights. Mother timely appealed.

Mother did not move to have the judge recused prior to the trial on the motion to terminate her parental rights. She argues that her constitutional right to an impartial judge was violated and therefore she may bring this issue for the first time on appeal. While we do not generally review constitutional claims raised for the first time on appeal, there are exceptions. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). The three recognized exceptions are: "(1) [t]he newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights or (3) the district court is right for the wrong reason." *State v. Ortega-Cadelan*, 287 Kan. 157, Syl. ¶ 1, 194 P.3d 1195 (2008.)

Mother argues she has a fundamental right to due process in terminating her right to parent her children and, therefore, we should consider this for the first time on appeal because it is necessary to prevent denial of a fundamental right and serves the ends of justice. The State argues that Mother's failure to argue specifics regarding how the

12

exception applies precludes her from having this issue heard. In *Ortega-Cadelan*, the Kansas Supreme Court stated the defendant failed to argue any specifics regarding how the issue satisfied an exception. 287 Kan. at 160. The court then looked at whether it was able to analyze the merits of the issue based on the record and ultimately found that the argument presented for the first time on appeal was not properly before the court. 287 Kan. at 160-161.

Here, the record does not demonstrate why the consideration of this claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights. Mother argues her right to parent her children is a fundamental right. *See In re S.R.*, 34 Kan. App. 2d 202, 210, 116 P.3d 43 (2005.) Mother also argues that due process requires the determination of the matter by a fair and impartial judge. *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed 942 (1955). Because this issue involves a fundamental right, it falls into the second exception outlined above and may be heard for the first time on appeal.

Appellate courts have unlimited review over allegations of judicial misconduct. *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010). See also *State v. Moyer*, 302 Kan. 892, 920, 360 P.3d 384 (2015) (unlimited review over whether a trial court judge's recusal is required); *State v. Robinson*, 293 Kan. 1002, 1032, 270 P.3d 1183 (2012) (unlimited review in evaluating an affidavit in support of a motion for recusal filed under K.S.A. 20-311d). The party alleging judicial misconduct bears the burden of establishing that misconduct occurred and that the misconduct prejudiced the party's substantial rights. *State v. Hudgins,* 301 Kan. 629, 637-38, 346 P.3d 1062 (2015).

An appellate court must review the particular facts and circumstances of each case to determine whether judicial comments, other than jury instructions, rise to the level of judicial misconduct. If a proper and reasonable interpretation will render the judge's remark unobjectionable, the remark cannot be found to be prejudicial. *State v. Kemble*,

13

291 Kan. 109, 113, 238 P.3d 251 (2010). The "[m]ere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment." *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002); see also *Moyer*, 302 Kan. at 924-25 (finding no likelihood of prejudice when judge's son, a police officer, was involved in the case but stricken from the witness list and the relationship was not mentioned in the trial; expressing concern about the judge's actions in striking son as witness in order to avoid recusal).

There are three substantive bases on which a litigant may argue that a judge's recusal is required:  (1) based on the statutory factors set forth in K.S.A. 20-311d(c); (2) based upon the standards of the Kansas Code of Judicial Conduct; and (3) based on the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Moyer*, 302 Kan. at 920. See generally Kansas Code of Judicial Conduct, Rule 601B (2015 Kan. Ct. R. Annot. 745-788) (canons, rules, and comments guiding judges' conduct effective March 1, 2009).

The United States Supreme Court has characterized a due process claim as the "constitutional floor" on recusal claims, while the ceiling is set by "common law, statute, or the professional standards of the bench and bar.*" Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 889, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009) (quoting *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 [1997]).

A judge may recuse himself or herself without a specific request from any of the parties in the proceeding. *State v. Meyer*, 1 Kan. App. 2d 29, 30, 561 P.2d 877 (1977). "The purpose of the law is that no judge shall hear and determine a case in which he is not wholly free, disinterested, impartial, and independent." *Tootle v. Berkley*, 60 Kan. 446, 56 Pac. 755 (1899.)

Under the Kansas Code of Judicial Conduct Rule 601B, Canon 3, Rule 3.1 (2015 Kan. Ct. R. Annot. 767), "[a] judge may engage in extrajudicial activities, except as prohibited by *law* or this Code. However, when engaging in extrajudicial activities, a judge shall not participate in activities that would appear to a reasonable person to undermine the judge's *independence*, *integrity*, or *impartiality*; or demean the judicial office." If a judge inadvertently receives an unauthorized ex parte communication that bears on the substance of the matter "the judge shall make provision promptly to notify the parties of the substance of the communication and provide the parties with the opportunity to respond." Kansas Code of Judicial Conduct Rule 601B, Canon 2, Rule 2.9(B) (2015 Kan. Ct. R. Annot. 760).

Judge Sloan was not biased by the ex parte communication she received from the detective. She met her duty under the Kansas Code of Judicial Conduct. Upon receiving the email, she notified the parties and forwarded the email that same day. Therefore, she met her ethical obligation under the Code.

Judge Sloan was not biased against Mother from the ex parte communication she received. We are to presume that the lower court considered only properly admissible evidence in reaching its decision, unless the record demonstrates the contrary. *State v. Gordon*, 219 Kan. 643, Syl. ¶ 11, 549 P.2d 886 (1976.) There is no evidence from the record that Judge Sloan relied on the email when making her determination that Mother's parental rights be terminated. While the judge did include evidence of Bro.B's broken leg when making her ruling as to why there was clear and convincing evidence that the parents were unfit, she included multiple other incidents that occurred over the course of the case.

It is clear that Judge Sloan was not biased and, therefore, did not need to *sua sponte* recuse herself, because she allowed the case to be continued over the period of almost 3 years. After the first reintegration plan, Judge Sloan gave the parents a second

15

chance at reintegration. When they did not succeed at that plan, Judge Sloan granted the parents a modified reintegration plan. For all three of the plans, Judge Sloan granted extensions of time for the parents to continue reintegration efforts. If Judge Sloan was biased against Mother, she likely would not have allowed the case to continue from August 6, 2013, when she received the email from the detective, until the termination hearing more than 2 years later on November 17, 2015. She continued to work with the parents and allow them extensions on their reintegration efforts.

Because Mother has not shown that the alleged misconduct prejudiced her substantial rights, Judge Sloan was not required to *sua sponte* recuse herself and Mother's due process rights were not violated.

Mother next contends she was denied due process based on ineffective assistance of counsel.

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. When the district court conducts a full evidentiary hearing on such claims, the appellate courts determine whether the district court's findings are supported by substantial competent evidence and determine whether the factual findings support the court's legal conclusion. The appellate courts apply a de novo standard to the district court's conclusions of law. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

To prevail on a claim of ineffective assistance of counsel, Mother must show "'(1) counsel's representation fell below an objective standard of reasonableness, considering all the circumstances, and (2) but for counsel's deficient performance there is a reasonable probability that the outcome of the proceeding would have been more favorable to [Mother].'" *Rowland v. State*, 289 Kan. 1076, 1083, 219 P.3d 1212 (2009).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different, with a reasonable probability meaning a probability sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

As a general rule, an appellate court will not consider an allegation of ineffective assistance of counsel raised for the first time on appeal. *State v. Dull*, 298 Kan. 832, 839, 317 P.3d 104 (2014). "[G]enerally the factual aspects of a claim of ineffective assistance of counsel require that the matter be resolved through a K.S.A. 60-1507 motion or through a request to remand the issue to the district court for an evidentiary hearing under *State v. VanCleave*, 239 Kan. 117, 119-21, 716 P.2d 580 (1986) [Citation omitted]." *State v. Galaviz*, 296 Kan. 168, 192, 291 P.3d 62 (2012).

An appellate court considers a claim of ineffective assistance of counsel for the first time on appeal only when there are no factual issues and the two-prong ineffective assistance of counsel test can be applied as a matter of law based upon the appellate record. *Wimbley v. State*, 292 Kan. 796, 807, 275 P.3d 35 (2011). The Kansas Supreme Court has "rarely found an exception to the general rule that an ineffective assistance of counsel claim should be first considered by the district court." *Trotter v. State*, 288 Kan. 112, 128, 200 P.3d 1236 (2009.)

Mother did not allege ineffective assistance of counsel against her attorney, Tobi Bitner, at any time in the district court. She argues that the newly asserted claim involves only a question of law that arises on proved or admitted facts. Because she argues there is

17

no factual issue, she states we may consider this issue where the record on appeal is sufficient to examine the claims of error. However, if we find the record does not provide sufficient grounds for review, Mother requests the matter be remanded for a hearing under *State v. VanCleave*, 239 Kan. 117. Therefore, we must analyze the ineffective assistance of counsel claim to determine whether a *VanCleave* remand is necessary.

The State contends that Mother simply argues one of the exceptions applies and does not specify how the issue satisfies the exception. The State further argues we should not guess why Mother believes the record is sufficient to consider the ineffective assistance of counsel claim, and she fails to explain why we should not consider the issue. However, the issue must be analyzed regardless due to the possibility of a remand pursuant to *VanCleave*. 239 Kan. at 120.

The State disagrees with Mother, who argues that *Strickland v. Washington* applies to this case. Mother argues she was denied effective assistance of counsel which deprived her of due process. However, *Strickland* is based on the right to counsel in a criminal proceeding under the Sixth Amendment to the United States Constitution, whereas here the right to counsel in a termination of parental rights proceeding is based on the Due Process Clause. *Lassiter v. Department of Social Services of Durham County, N.C.*, 452 U.S. 18, 31-33, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981.)

Mother argues in her brief that Bitner was ineffective for various reasons. These claims will be looked at individually.

First, Mother argues that Bitner was ineffective because she did not file a motion to recuse the judge once she was aware of the ex parte communication and after being present for the alleged bias demonstrated by the judge. As analyzed above, the ex parte communication received by Judge Sloan and the comments made at later hearings did not deny Mother due process. Further, there were various parties present during these

18

hearings including the State, Father, and his attorney, Mother, and her attorney, the guardian ad litem, and M.E.'s attorney. None of them objected to the statements made by the judge and none of them asked the judge to recuse herself.

There is also no evidence that the proceeding would have turned out differently if Bitner had filed a motion for the judge to recuse herself. There was clear and convincing evidence to find that Mother is unfit and her actions were unlikely to change in the foreseeable future. There was no bias on part of the judge and there is a high probability that the outcome of the proceeding would have been the same. See *Sprague*, 303 Kan. at 426.

Second, Mother argues that Bitner failed to defend various objections. First, a "due process violation exists only when a claimant is able to establish that he or she was denied a specific procedural protection to which he or she was entitled." *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007). Therefore, it is questionable whether the failure to defend a civil objection can be a due process violation. 284 Kan. at 166. Second, we are to strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *Kelly*, 298 Kan. at 970. In addition, when the district court sustained an objection to hearsay, Bitner would rephrase the question in order to get the information into the record. For example, the State objected to hearsay when Bitner asked about marriage counseling services. She then rephrased the question after the objection was sustained. This was not a due process violation and Bitner was not ineffective when it came to defending objections in court.

Next, Mother argues that Bitner failed to remind the district court that anything can be used to refresh a witness' recollection as long as the witness has an independent recollection of the matter. The court was concerned that Mother was using notes during her testimony because the court did not know who drafted the notes. The court checked to

make sure the notes were drafted by Mother and then allowed her to use them. This was not a violation of Mother's due process rights because she was allowed to use the notes.

Mother also argues that Bitner should have challenged the district court when it did not allow her to attend her church because the State had violated her rights under the First Amendment to the United States Constitution. Mother was not forbidden to attend her church, she was just asked to attend a different service from her children because of the safety plan that was in place.

In addition, Mother argues that Bitner did not present evidence of the State's failure to rehabilitate. However, during cross examination, Bitner attacked the quality of rehabilitative work and programs provided by KVC.

Mother also argues that Bitner failed to object to the district court's granting authority to KVC to place the children back in her home. Mother argues that KVC should have filed a motion asking the court to allow it to place the children with the parents. This could not have prejudiced Mother because it allowed KVC to place the children back in her home.

Here, even if *VanCleave* does apply, it does not require a remand in this case. The claims of ineffective assistance of counsel that Mother has against Bitner are not violations of Mother's due process rights. In addition, the allegations against Bitner do not rise to the level of ineffective assistance of counsel, especially considering we are to strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *Kelly*, 298 Kan. at 970. Therefore, the district court's ruling is affirmed.

Mother next argues the district court's finding that her unfitness was not likely to change in the foreseeable future was not supported by the record.

20

The Kansas Legislature has specified that the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2015 Supp. 38-2250. In addition to child in need of care adjudications, the clear and convincing evidence standard of proof applies to all termination of parental rights cases. K.S.A. 2015 Supp. 38-2269(a). Clear and convincing evidence is that "which is sufficient to establish that the truth of the facts asserted is 'highly probable.'" *In re B.D.-Y.*, 286 Kan. 686, 696, 187 P.3d 594 (2008).

K.S.A. 2015 Supp. 38-2269(a) states:

"When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future."

In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

When determining how to define "foreseeable future," the court examines the term from the perspective of a child. *In re M.H.*, 50 Kan. App. 2d 1162, 1170-71, 337 P.3d 711 (2014). Children and adults have different perceptions of time, and a child has the right to permanency within a time frame that is reasonable to them. 50 Kan. App. 2d at 1170-71. The district court may draw inferences from the past conduct of a parent to determine that the parent's conduct will not likely change in the foreseeable future. *In re Z.C.*, No. 97,032, 2007 WL 1310097, at *3 (Kan. App. 2007) (unpublished opinion).

Mother argues that she and Father had been successful with Williams as case manager and they were about to regain custody of their children. Mother argues that when Perez became their case worker, Perez did not effectively communicate tasks to her and contributed to her confusion about what was expected from her. Essentially, she argues that the deteriorating relationship with KVC and its failure to initially provide services made her unable to regain progress.

There was ample evidence in the record to support the district court's finding that Mother's unfitness as a parent was unlikely to change in the foreseeable future. Mother's interaction with DCF began in 2004 when Ma.E. was found wandering the streets alone. A second case with DCF was reported in 2009, when Me.E was physically abused by Father. The third case was in November 2012, when it was alleged Mother was using opiates while pregnant with Bro.B. The fourth case was in December 2012, for lack of supervision when it was reported that the four children at the time had been left home alone on at least two occasions. The fifth case occurred in April 2013, when Mother and Father failed to pick the children up from school and Bro.B. had a bad rash.

Mother has continued to have trouble with the law throughout the case period. She had criminal cases ranging from 2000 to 2014, including the theft charge where the children were present. A list compiled in 2012 showed that Mother had 24 police incidents since 2003. Both Mother and Father had served time in jail during this case. In addition, both parents demonstrated throughout the case that drugs were an ongoing problem.

The parents received two reintegration plans for this case as well as a modified reintegration plan. During the first reintegration plan, Father was substantiated for physical abuse for breaking Bro.B.'s femur. At the end of the first plan, the parents were granted a second reintegration plan. While there was progress during the second plan, Mother was still on methadone and hid her pregnancy with R.L.B. from everyone on the

22

case. There was a continued concern with criminal charges, as Mother picked up two new charges. There was concern with unauthorized contact with the children and transportation troubles.

In the spring of 2014, Drovetta hoped the children could return home to the parents. However, during the summer additional problems arose. Mother and Father continued to minimize their actions and blame others. The children were removed from their grandparent's placement because of unauthorized contact from the parents. Mother did not decrease her methadone use and Father tested positive for amphetamines.

On October 8, 2014, the parents stipulated to their unfitness and received a modified reintegration plan. For several months, the plan went well, and KVC advocated for an extension of its plan and longer visits. However, this progress halted in April 2015, when the parents fought in front of the children during visits and upset the oldest child. The budget was also a problem because Mother and Father only had enough funds to support themselves but not their six children. Their van was also allegedly stolen, but a police report was never provided to KVC. In addition. Father had a blackout while driving and crashed their other car.

Both Mother and Father had continued legal issues during the modified reintegration plan. Father was required to register as an offender, which he did not. His probation was revoked and he had to spend 30 days in jail. Mother had a positive drug test for amphetamine, which she stated was from a diet pill she had taken from her friend, and her probation was extended to October 2016. She had to serve two weekends in jail because of the positive drug test.

One of the placements reported to KVC that the girls spent time with their friends on weekend visits with Mother and Father. The children were also being returned with empty stomachs and the parents did not take them to their extracurricular activities.

There were concerns about missed drug tests and honesty with Mother and Father. Drovetta also had concerns about long-term stability. In addition, there were concerns about employment, transportation, meal and bedtime schedules, copies of bills, bedroom space, and ongoing supervision issues.

After nearly 3 years of reintegration plans, the parents never progressed to a point where the children could be returned home. When progress was made, the parents would make a mistake and fall back. Drovetta testified it was not in the children's best interest to continue moving forward with reintegration. The parents were not in a position to properly care for all six children and it was in the children's best interests to have the parents' rights terminated and reach permanency through adoption.

Looking at Mother's pattern of conduct during the nearly 3 years of this case, it was clear her conduct would not change in the foreseeable future. See *In re Z.C.*, No. 97,032, at *3. There is clear and convincing evidence that her behavior will not change in the foreseeable future, and the six children are children in need of care. Therefore, the district court's ruling is affirmed.

Affirmed.