NOT DESIGNATED FOR PUBLICATION

No. 122,089

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ELGIN R. ROBINSON JR.,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BENJAMIN BURGESS, judge. Opinion filed September 9, 2022. Affirmed.

*Elgin R. Robinson Jr.*, appellant pro se.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON and HURST, JJ.

ATCHESON, J.: A jury sitting in Sedgwick County District Court in 2008 convicted Defendant Elgin R. Robinson Jr. of capital murder and a host of other felonies for hiring another man to murder C.B., his pregnant 14-year-old girlfriend. The State's theory was that Robinson feared he would be charged with statutory rape if C.B. gave birth because genetic testing would show him to be the baby's father. On direct appeal, the Kansas Supreme Court affirmed the convictions and Robinson's controlling sentence of life in prison without parole. *State v. Robinson*, 293 Kan. 1002, 1006, 270 P.3d 1183 (2012) (*Robinson I*).

1

Robinson then filed a motion for habeas corpus relief under K.S.A. 60-1507 on the grounds the lawyers representing him leading up to and during the trial were constitutionally ineffective in multiple ways, violating his right to counsel guaranteed in the Sixth Amendment to the United States Constitution. The district court appointed Michael Brown to represent Robinson and denied the motion after holding a nonevidentiary hearing. Robinson appealed that ruling, and this court affirmed the district court. *Robinson v. State*, No. 111,923, 2016 WL 1169381, at *1 (Kan. App. 2016) (unpublished opinion) (*Robinson II*). The Kansas Supreme Court declined to review our decision.

In the face of that adverse outcome, Robinson filed another 60-1507 motion attacking the work of Brown and of Michael Whalen and Krystle Dalke, who handled the appeal, as legally deficient. The district court summarily denied the motion without appointing a lawyer for Robinson or holding a hearing. Representing himself, as he did in the district court, Robinson has appealed the denial of his second 60-1507 motion, and that is what we now have in front of us. As with many litigants representing themselves, Robinson's appellate brief is long on rhetoric and noticeably short of well-crafted legal arguments. We find no basis warranting relief for Robinson and, therefore, affirm the district court.

Our discussion assumes the reader's familiarity with the facts of the crime, as developed at trial and outlined in the earlier appellate decisions, as well as the procedural progression of the direct criminal case and the first 60-1507 challenge. See *Robinson I*, 293 Kan. at 1006-12; see generally *Robinson II*, 2016 WL 1169381. We do not endeavor to reconstruct that factual and procedural history here.

ANALYSIS

*Legal Principles Governing 60-1507 Motions*

When a district court summarily denies a 60-1507 motion, we review the ruling without any particular deference, since it turns on the earlier record and the allegations in the motion. We can review those materials just as well as the district court can, and the district court has reconciled no conflicting testimony or other evidence in arriving at its decision. See *Bellamy v. State*, 285 Kan. 346, 354, 172 P.3d 10 (2007).

The Kansas Supreme Court has held that a convicted criminal defendant may bring a second or successive 60-1507 motion in exceptional circumstances. Those circumstances include inadequate legal representation in the earlier 60-1507 motion. See *Albright v. State*, 292 Kan. 193, 207, 251 P.3d 52 (2011); *Robertson v. State*, 288 Kan. 217, 228-32, 201 P.3d 691 (2009). The right to adequate representation in a 60-1507 proceeding rests on a common-law rule construing the statutes applicable to habeas corpus rather than on a constitutional guarantee. *Albright*, 292 Kan. at 200-01. The Kansas appellate courts, however, apply the constitutional standard for adequate legal representation enunciated in *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and repeatedly recognized in our decisions to assess a lawyer's performance in a 60-1507 proceeding. See *State v. Phillips*, 312 Kan. 643, 676, 479 P.3d 176 (2021); *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3, 4, 694 P.2d 468 (1985). What has become known as the *Strickland* test, therefore, governs the lawyers' handling of the first 60-1507 motion in the district court and on appeal. We set out those legal principles before turning to the particular arguments Robinson has raised in his appeal. Those principles apply to both trial and appellate lawyers. See *Miller v. State*, 298 Kan. 921, 929-30, 318 P.3d 155 (2014).

To prevail on a 60-1507 motion, a convicted defendant must show that his or her legal representation "fell below an objective standard of reasonableness" guaranteed by the right to counsel in the Sixth Amendment to the United States Constitution and that absent the substandard lawyering there is "a reasonable probability" the outcome in the criminal case would have been different. *Strickland*, 466 U.S. at 688, 694; *Phillips*, 312 Kan. at 676; *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). Reasonable representation demands that degree of "skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. A reasonable probability of a different outcome "undermine[s] confidence" in the result and marks the criminal proceeding as fundamentally unfair. 466 U.S. at 694. The movant, then, must prove both inadequate representation and sufficient prejudice attributable to that representation to materially question the resulting convictions. To reiterate, the performances at issue here are Brown's representation of Robinson in the district court on the initial 60-1507 motion and Whalen and Dalke's representation of him in the appeal of the district court's denial of that motion.

As the United States Supreme Court and the Kansas Supreme Court have stressed, review of the representation should be deferential and hindsight criticism tempered lest the evaluation of a lawyer's performance be unduly colored by lack of success notwithstanding demonstrable competence. See *Strickland*, 466 U.S. at 689-90; *Holmes v. State*, 292 Kan. 271, 275, 252 P.3d 573 (2011). Rarely should a lawyer's representation be considered substandard when he or she investigates the client's circumstances and then makes a deliberate strategic choice among arguably suitable options. *Strickland*, 466 U.S. at 690-91. Whether a lawyer had made reasoned strategic decisions bears on the competence component of the *Strickland* test.

Regardless of the inadequacy of legal representation, a 60-1507 motion fails if the movant cannot establish substantial prejudice. And the district court properly may deny a motion that falters on the prejudice component of the *Strickland* test without assessing

4

the sufficiency of the representation. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); see *Edgar v. State*, 294 Kan. 828, 843-44, 283 P.3d 152 (2012); *Oliver v. State*, No. 106,532, 2013 WL 2395273, at *5 (Kan. App. 2013) (unpublished opinion). In other words, even assuming a criminal defendant's legal representation fell below the *Strickland* standard, he or she is not entitled to habeas corpus relief if the result would have been no different with competent counsel. We, of course, may affirm the denial of relief based on the lack of demonstrable prejudice.

In general, the courts look at a lawyer's overall performance in determining whether the representation was adequate, meaning that a minor mistake or even a number of minor mistakes do not breach the duty owed. See *Harrington v. Richter*, 562 U.S. 86, 110, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); *Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); *Bland v. Hardy*, 672 F.3d 445, 450 (7th Cir. 2012) ("[T]he question under *Strickland* is not whether the lawyer made a mistake, even a serious one; it is whether the lawyer's *overall* performance was professionally competent."). But a single error causing sufficiently substantial legal harm to the defendant to call into question an adverse outcome will suffice. See *Miller*, 298 Kan. at 938-39.

*Robinson's Points on Appeal*

We now turn to the particular deficiencies Robinson attributes to Brown and to the appellate lawyers representing him in *Robinson II* and consider them against the legal precepts governing 60-1507 proceedings.

*Trial Lawyers' Purported Conflict of Interest*

Robinson contends Brown failed to fully explore a purported conflict his trial lawyers labored under because of inappropriate conduct by a private investigator they had hired to work on the case. Emery Goad, the investigator, leaked information to The Wichita Eagle in May or June 2008 to the effect Robinson had intimate relationships with two other underage girls. The newspaper printed a story based in part on the leak in June 2008, about four months before the trial. When the trial lawyers found out what Goad had done, they fired him. There are some discrepancies in the record as to whom the lawyers reported Goad's improper conduct. Robinson, however, filed an ethical complaint against his trial lawyers. As we pointed out in *Robinson II*:

> "According to correspondence from the Kansas Disciplinary Administrator's Office in the record, the Disciplinary Administrator found no ethical violation on the part of the lawyers because they had no advance knowledge of the investigator's communications with the reporter, did not condone the investigator's actions, and immediately fired the investigator when they learned what he had done." 2016 WL 1169381, at *6.

Brown and the lawyers handling the appeal in *Robinson II* asserted the trial lawyers had a conflict because their personal interest lay in not revealing Goad's inappropriate conduct, thereby dividing their loyalties between Goad and Robinson. But they never fleshed out the argument with an explanation of how exactly the trial lawyers were enmeshed in some conflict, especially when they discharged Goad. Nor did the argument advance concrete examples of how the trial lawyers' representation of Robinson was diluted as a result. We, therefore, found the point unavailing. *Robinson II*, 2016 WL 1169381, at *7. In his second 60-1507 motion and now on appeal, Robinson revisits the issue in an effort to show that Brown's handling of it fell below the standard for adequate representation.

We begin with some background on the law governing conflicts of interest. The courts understandably recognize that a criminal defendant is entitled to be represented by a lawyer without divided loyalties and a defense lawyer laboring under such a conflict will fall short of the Sixth Amendment guarantee of adequate representation. *Mickens v. Taylor*, 535 U.S. 162, 166-67, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002); *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); *Sola-Morales v. State*, 300 Kan. 875, 883, 335 P.3d 1162 (2014). The courts have identified three recurrent situations giving rise to impermissible "active" conflicts:  (1) the district court permits a lawyer to represent multiple clients with antagonistic interests in the same proceeding despite an objection to the representation; (2) a lawyer represents multiple clients but no objection has been lodged; and (3) the representation of a current client conflicts either with a duty owed a former client or with the lawyer's own personal or financial interests. *Sola-Morales*, 300 Kan. at 883-84. Robinson tries to fit his conflict claim into the personal interest portion of the third category.

In addressing this point, we follow the lead of the *Robinson II* panel and assume without deciding that his trial lawyers had such a personal conflict as a result of the private investigator's leak to the newspaper. But, like the earlier panel, we have difficulty seeing any active conflict, since the lawyers promptly dismissed the investigator from the defense team well before trial. *Robinson II*, 2016 WL 1169381, at *7.

The Kansas Supreme Court has commonly referred to the third category of conflicts as the "*Mickens* reservation" because the United States Supreme Court has not expressly identified whether the defendant must show merely an adverse effect on his or her representation, as required under *Cuyler*, or must show sufficiently deficient representation to undermine confidence in the outcome of the criminal case, as required under *Strickland*, to obtain relief. *Fuller v. State*, 303 Kan. 478, 487, 363 P.3d 373 (2015); *Sola-Morales*, 300 Kan. at 884. The Kansas Supreme Court has yet to resolve the *Mickens* reservation by endorsing one or the other standard. See *State v. Moyer*, 309 Kan.

7

268, 279-80, 434 P.3d 829 (2019) (recognizing lack of governing standard); *Nicks v. State*, No. 122,386, 2022 WL 2112427, at *3-4 (Kan. App. 2022) (unpublished opinion) (noting governing standard remains "an open question"). Here, again, we borrow from the *Robinson II* panel and assume the adverse effect standard would apply to any decision of the trial lawyers animated by what we have assumed to be a conflict of interest under the *Mickens* reservation. We do so only because that standard is more favorable to Robinson. *Robinson II*, 2016 WL 1169381, at *7. To satisfy the *Cuyler* standard, Robinson would have to show his lawyers either abandoned or never pursued an objectively plausible defense strategy, thereby adversely affecting his representation. See *Sola-Morales v. State*, No. 118,451, 2019 WL 6041443, at *7 (Kan. App. 2019) (unpublished opinion).

At this juncture, then, Robinson contends Brown mishandled the original 60-1507 motion by failing to cite and argue specific purported failings of his trial lawyers rooted in their purported *Mickens* reservation conflict of interest. We move on to what Robinson now identifies as those trial decisions.

At trial, the State called Everett Gentry who testified Robinson hired him to kill C.B. Gentry, in turn, paid Theodore Burnett to help him. Gentry knew C.B. and lured her into a car with him and Burnett. Instead of taking C.B. to meet Robinson as he claimed he would, Gentry made several stops and eventually drove to a rural area of Butler County, where the two men strangled C.B. and buried her body in a shallow grave that was discovered about a week later. Robinson testified in his own defense and acknowledged his intimate relationship with C.B. but denied any involvement in arranging her murder. Robinson was in the Kansas City area when C.B. was killed.

As we outlined in *Robinson II*, the trial lawyers offered the jury two alternative motives for Gentry to have acted on his own in murdering C.B. First, Robinson had banished Gentry from his burgeoning music promotion business, and Gentry knew

8

Robinson was fearful of being prosecuted for statutory rape after C.B. gave birth, so he killed her to get back in Robinson's good graces. Second, and quite to the contrary, Gentry murdered C.B. as revenge for Robison's decision to oust him from the business.

In preparing for trial, the lawyers had a video prepared showing the route Gentry and Burnett traveled with C.B., including what Gentry described as the murder scene. The lawyers did not introduce the video at trial. Robinson now contends they chose not to because they would have had to call Goad as a witness to lay a foundation for the video and, as a result, his leak to the newspaper would have been exposed. Robinson asserts the video would have undermined Gentry's testimony (and his credibility) because the spot of the murder is just off a well-traveled road and, thus, readily visible to passing motorists. So, according to Robinson, the jurors would have dismissed Gentry as an inveterate liar and, thus, returned not guilty verdicts. On Robinson's theory, Brown was demonstrably ineffective for failing to make this argument in the initial 60-1507 proceeding.

Robinson's contention fails on multiple fronts. Although the record indicates a video had been prepared ahead of trial, the video itself is not in the record. We do not know what exactly the video depicts; Robinson may or may not have correctly described the content. That's not good enough, since Robinson bears the burden here. See *State v. Bryant*, 285 Kan. 970, 980, 179 P.3d 1122 (2008) (party appealing has obligation to furnish adequate record to show claimed error). That alone dooms the point. In addition, however, the record shows that Dwight Applegate, an associate of Goad's, participated in videoing the route and prepared the copy that would have been presented in court. Applegate would have been able to lay the foundation for the admission of the video during trial. See *State v. Mallett*, No. 122,282, 2020 WL 7294282, at *4 (Kan. App. 2020) (unpublished opinion) (foundation to admit video or similar recording); 29A Am. Jur. 2d Evidence § 977. Contrary to Robinson's suggestion, Goad would not have been a necessary trial witness. That, too, independently undoes the contention. Finally, even if the video showed what Robinson suggests about the murder location, it wouldn't have

9

had the impact on the jury he prophesizes. C.B. was strangled in a car after dark; quickly passing motorists would not have realized what the two men were doing. The video might have suggested Gentry wasn't very good at planning murders—something his own testimony tended to establish—but it wouldn't have proved him to be a liar.

In short, the trial lawyers' decision not to offer the video (assuming it depicted what Robinson asserts) did not adversely affect the defense at trial and, therefore, would not support a claim for relief on a 60-1507 motion. There was other circumstantial evidence implicating Robinson in arranging the murder of C.B. See *Robinson I*, 293 Kan. at 1012 (Robinson made computer searches on how to kill a baby, on causing a miscarriage, and on finding a missing person—consistent with the motive the State ascribed to him.). Brown, therefore, did not inadequately represent Robinson in this respect, since he had no obligation to pursue a legally empty point, and habeas corpus relief cannot be premised on a lawyer's failure to raise a losing claim. See *Littlejohn v. State*, 29 Kan. App. 2d 506, 507-08, 28 P.3d 448 (2001); *Warren v. State*, No. 123,547, 2022 WL 816313, at *3 (Kan. App. 2022) (unpublished opinion).

*Alternative Motive for Gentry to Kill C.B.*

Robinson now asserts his trial lawyers did not aggressively pursue a theory that Gentry killed C.B. because he believed he was the father of her child. Although the issue was unsuccessfully litigated in *Robinson II*, Robinson augments those arguments by trying to tie the failure of his trial lawyers to their purported desire to keep Goad's misconduct under wraps. But the connection he attempts to forge simply doesn't exist, and he hasn't unearthed any evidence that would have been admissible during his trial to support this third theory for Gentry's motive.

The notion that Gentry thought he may have fathered C.B.'s child traces to a recorded statement Bridget Bush gave law enforcement officers to the effect that a man

10

known to her as Jay Gutta told her Gentry made such a comment in his presence months earlier. Bush's statement is classic hearsay and would have been inadmissible at trial to prove Gentry said any such thing. The record indicates Goad and the trial defense team determined Jay Gutta was an alias of Larry Stewart and came up with past addresses for Stewart. They either never found Stewart or found him and determined he would be unhelpful as a trial witness. We don't know for sure.

Brown never offered an affidavit from Stewart to the effect he would have been available to testify at Robinson's trial and recounting what Gentry may or may not have said to him. The omission precluded Robinson from showing any possible prejudice in his initial 60-1507 motion, since what Stewart might have testified to during the trial remained no more than unsupported speculation resting on an inadmissible secondhand account. See *Robinson II*, 2016 WL 1169381, at *4.

Robinson's current spin on this issue tumbles into the same vortex. He has provided nothing from Stewart, so he hasn't shown any prejudice attributable to his trial lawyers or to Brown. Moreover, his effort to link some coverup of Goad's leak to the newspaper and the failure to produce Stewart as a trial witness makes no sense. If Stewart had testified at trial, nothing about his appearance or testimony would have prompted a disclosure (or a further disclosure) of Goad's conduct. Goad and the newspaper leak would have been irrelevant to Stewart's testimony either on direct examination or cross-examination.

*Purported Prosecutorial Corruption*

Robinson argues some form of "prosecutorial corruption" leading up to and during his trial because the prosecutors did not disclose to the district court his trial lawyers' purported conflict of interest arising from Goad's improper conduct. In turn, Robinson contends Brown failed to adequately represent him in the initial 60-1507 proceeding by

11

overlooking this issue. We suppose prosecutors have a duty to call to the district court's attention a possible conflict of interest on the part of a defense lawyer. The district court can then inquire further to determine if an actual conflict exists. See *State v. Stovall*, 298 Kan. 362, 370, 312 P.3d 1271 (2013) (district court duty to inquire into possible conflict of interest). By so acting, prosecutors head off potential problems that could undermine a conviction if an actual conflict of interest went unaddressed. And in that way, they also have a material incentive to speak up. Whether failing to act amounts to prosecutorial error—or, to borrow Robinson's phrase, prosecutorial corruption—is not something we need to decide.

As we have suggested, Goad's leak to the media and the response of Robinson's trial lawyers in firing Goad did not create an active conflict of interest compromising their representation of him. The various suggestions Robinson floated in *Robinson II* and here do not establish an active conflict or any substantive detriment to his defense ahead of or during the trial. In short, the prosecutors had nothing to flag for the district court and did not err, let alone act corruptly.

*Prosecutorial Error or Misconduct in Closing Argument*

Robinson now offers what he characterizes as five instances of prosecutorial error or misconduct during his trial that have not been raised before. From Robinson's papers, we can't tell if he is asserting these as freestanding claims for relief or as substantive deficiencies in Brown's representation of him in the original 60-1507 proceeding. If we were to treat them as the former, they would fail because they would amount to trial errors that should have been raised on direct appeal and are now procedurally barred. *Rowland v. State*, 289 Kan. 1076, 1087, 219 P.3d 1212 (2009); *Woods v. State*, 52 Kan. App. 2d 958, 964, 379 P.3d 1134 (2016). We, therefore, assume Robinson is arguing that Brown inadequately represented him by failing to assert a 60-1507 claim that the lawyers handling the direct criminal case were themselves legally ineffective for not raising those

12

purported instances of prosecutorial error. In that light, the argument entails preserved 60-1507 claims we may review.

As our first task, we consider whether any of the five statements the prosecutors made to the jurors amount to sufficiently prejudicial error to have affected the outcome of the trial. If they do not, then Robinson could not have suffered any legal harm redressable in a 60-1507 proceeding. And, in turn, the point would be without merit.

In 2016, the Kansas Supreme Court revamped the analytical protocol for reviewing claims of prosecutorial error or misconduct in *State v. Sherman*, 305 Kan. 88, 108-09, 378 P.3d 1060 (2016). Our court has held that the pre-*Sherman* method of analysis applies in assessing claims arising from criminal cases in which the direct appeals concluded before *Sherman* was decided. *Brown v. State*, 58 Kan. App. 2d 808, 831-32, 475 P.3d 689 (2020); *Sumpter v. State*, No. 117,732, 2019 WL 257974, at *11 (Kan. App. 2019) (unpublished opinion).

Before *Sherman*, the Kansas courts used a well-recognized, two-step test for measuring the impropriety of the State's closing arguments in criminal cases:

> "'First, the appellate court must decide whether the comments fall outside the wide latitude afforded a prosecutor in discussing the evidence and the law. Second, if the prosecutor has exceeded those bounds, the appellate court must determine whether the improper comments constitute plain error; that is, whether the statements prejudiced the jury to the extent the defendant was denied a fair trial. *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009) (outlining mode of analysis); see *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009) (noting considerable range permitted advocates, including prosecutor, in arguing their causes in jury summations).'" *State v. Franco*, 49 Kan. App. 2d 924, 938, 319 P.3d 551 (2014) (quoting *State v. Schreiner*, 46 Kan. App. 2d 778, 793-94, 264 P.3d 1033 [2011], *rev. denied* 296 Kan. 1135 [2013]).

13

If the argument fell outside what is proper, the courts then looked at three factors to assess the degree of prejudice:

> "'(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, [22-24,] 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [conclusion beyond a reasonable doubt that the error . . . changed the result of the trial], have been met.' [Citations omitted.]" *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009).

For his first claim, Robinson points to a snippet of the State's rebuttal argument in which the prosecutor told the jurors to give Robinson's testimony the weight it deserves and added, "The State states to you it doesn't deserve very much." The initial part of the remark offers a correct statement since the jury's function and duty is to weigh the evidence, including witness testimony. *State v. Betancourt*, 301 Kan. 282, 305, 342 P.3d 916 (2015). But the second part amounts to an impermissible expression of the prosecutor's opinion of Robinson's credibility. *State v. Pribble*, 304 Kan. 824, 835, 375 P.3d 966 (2016). The remark was not excused because the prosecutor referred to "the State's" opinion rather than his own; the legal effect is the same.

But, as in *Pribble*, the comment was isolated and fleeting. It would have had little or no effect on the jurors, especially coupled with the correct representation that they were to make credibility determinations. In comparable circumstances, the *Pribble* court found such an error to be harmless. 304 Kan. at 836. The same is true here. In turn, neither Robinson's lawyers handling the direct criminal case nor Brown and the appellate lawyers in *Robinson II* can be faulted for failing to raise a meritless point. See *Miller*, 298 Kan. at 932; *Littlejohn*, 29 Kan. App. 2d at 507-08; *Warren*, 2022 WL 816313, at *3.

14

Robinson next contends the prosecutor erred in posing this question to the jurors in the rebuttal argument: "Do you really believe what [Robinson] has to say?" The question was obviously rhetorical and deployed as a device to suggest Robinson's lack of credibility. It came amidst the prosecutor's explanation of why the evidence showed Robinson to be unworthy of belief. In closing argument, prosecutors are permitted to outline how and why the evidence renders certain witnesses, including a testifying defendant, less than credible. See *State v. Williams*, 299 Kan. 911, 935-36, 329 P.3d 400 (2014); *State v. Finley*, 273 Kan. 237, 246, 42 P.3d 723 (2002). Likewise, rhetorical questions are not inherently off-limits in closing arguments and may be quite appropriate depending on the circumstances. See *State v. Ortega*, 300 Kan. 761, 777, 335 P.3d 93 (2014). The prosecutor's remark here was fair comment and, therefore, not error. Again, Robinson gets no relief based on his lawyers' decisions to forgo pursuing a meritless claim.

In the same vein, Robinson now disputes the propriety of the prosecutor rhetorically asking the jurors, "Why wouldn't you believe Everett Gentry?" Robinson has not provided a citation to the trial record where the prosecutor, in fact, posed that question. We are not obligated to search the record to confirm Robinson's assertion and could dismiss the point for that reason. *State v. Kee*, 27 Kan. App. 2d 677, 682, 6 P.3d 938 (2000); *Lanier Trucking, Inc. v. Long*, No. 120,061, 2020 WL 4722319, at *9 (Kan. App. 2020) (unpublished opinion). In any event, the remark seems to be a bookend to the rhetorical question about Robinson, and it, too, looks to be fair comment, especially without some context suggesting otherwise.

Fourth, Robinson challenges the prosecutor's statement in closing argument that he received telephone calls that C.B. was missing while he was in bed in Kansas City with his former girlfriend and simply rolled over and went back to sleep. Robinson says the assertion was factually inaccurate and inflammatory. He asserts he was out and about in Kansas City and telephone records admitted at trial would confirm his location. But those

documents are not in the appellate record, so we cannot review them. Robinson does not point us to anything else that would undermine the prosecutor's representation to the jury. On that basis, we are disinclined to find any error in that part of the prosecutor's closing argument. *State v. Kidd*, 293 Kan. 591, 601, 265 P.3d 1165 (2011); *State v. Paul*, 285 Kan. 658, 670, 175 P.3d 840 (2008); *Harman v. State*, No. 108,478, 2013 WL 3792407, at *1 (Kan App. 2013) (unpublished opinion) ("When there are blanks in [the] record, appellate courts do not fill them in by making assumptions favoring the party claiming error in the district court.").

Moreover, the gist of the argument seemed to be Robinson was in no hurry to follow up on the suggestion C.B. was missing or to return to Wichita because he expected she would be missing and knew the reason why. That core message came within the realm of fair comment and did not rest on Robinson's precise location or activity at the time of the calls. Any resulting prejudice to Robinson would have been relatively minimal, and any error harmless. Robinson's lawyers, therefore, had no obligation to pursue this issue and did not inadequately represent him by failing to raise it.

Finally, Robinson challenges the prosecutor's request of the jurors to imagine what C.B. might have said in several telephone calls she placed to Robinson in the hours before her death. The prosecutor suggested she would have asked Robinson, "Where are you?" and would have told him, "You said you'd be here." Some of the calls may have been placed after Gentry and Burnett met C.B. and claimed they were taking her to meet Robinson. Robinson again refers to his telephone records and says they would show he never received any calls from C.B. We don't have those records, so his claim is unsupported in that respect.

But Robinson also submits the type of jury argument—constructing hypothetical scripts of what murder victims likely would have thought or said in the time leading up to their deaths—is improper. On that, he is correct. *State v. De La Torre*, 300 Kan. 591, 610,

16

331 P.3d 815 (2014); *State v. Kleypas*, 272 Kan. 894, 1113-14, 40 P.3d 139 (2001). The argument obviously ventures outside the trial evidence and necessarily becomes impermissibly speculative. 272 Kan. at 1113-14. In addition, the scenarios are commonly crafted in ways tending to inflame jurors' passions, especially since they have no direct anchor in the evidence. *De La Torre*, 300 Kan. at 610.

Although this argument constituted prosecutorial error, we doubt it could be considered reversable error under the pre-*Sherman* test. The prosecutor's hypothetical was brief, consisting of three short sentences without further elaboration in an extended closing argument at the end of a lengthy trial. In addition, the statements imputed to C.B. in the hypothetical were comparatively benign—questioning where Robinson was, since Gentry represented they were to meet. The scenario did not trade on the extraordinary anguish and fear murder victims presumably experience when they realize their violent deaths are imminent—the themes often played out in the imagined scripts. See *Kleypas*, 272 Kan. at 1112-13. In that respect, the argument was not gross and flagrant. But the *Kleypas* decision condemning that type of argument was decided in 2001, so a prosecutor trying a case in 2008 should have known it was improper. That at least suggests ill will. The argument, however, would not have carried significant weight with the jurors in light of the totality of the evidence. We have no doubt the outcome would have been the same had the prosecutor refrained from arguing what C.B. presumably would have said to Robinson. The argument was neither the linchpin of the State's case nor a persuasive vehicle that would have carried the jurors across the threshold of their decision to convict. Accordingly, Robinson cannot now obtain relief because his lawyers did not pursue an error that would have proved harmless.

In the interest of completeness, we have also considered Robinson's claims of prosecutorial error under the *Sherman* standard. The first step borrows from the earlier protocol and asks whether the challenged comments fall within the broad discretion afforded prosecutors in crafting fair jury arguments. If so, there is no prosecutorial error,

17

and the judicial inquiry ends. 305 Kan. at 109. The *Sherman* court jettisoned the three-part test for reversable error to be applied to an improper argument in favor of simply assessing whether the error deprived the defendant of a fair trial based on the entire record. In making that determination, the court should apply the constitutional error standard requiring the State to demonstrate beyond a reasonable doubt the improper argument did not affect the outcome of the trial. 305 Kan. at 109.

Only the first and last challenges Robinson has made to the State's closing argument amount to error. As we have already explained, neither was of such an objectionable character to be reversible error under the pre-*Sherman* test. Largely for the same reasons, considered against the trial evidence, we are persuaded beyond a reasonable doubt neither argument alone nor both together played a role in the jury's verdicts. Gentry's testimony and the surrounding circumstances painted a strong picture of Robinson's guilt, including an entirely plausible motive. The erroneous arguments were brief, superficial, and largely tangential to the controlling facts and law. They were comparatively mild and could hardly be characterized as inflammatory, especially cast against the truly despicable circumstances of C.B.'s murder established in the trial evidence. To repeat, Robinson, therefore, has not shown grounds for relief under 60-1507, since the errors he asserts would not have materially benefitted him even if they had been raised in the direct criminal case or in his initial collateral attack.

*Cumulative Error*

In his appellate brief, Robinson makes an abbreviated argument that he should be granted a new trial because of cumulative error. In a direct criminal appeal, a defendant may argue the collective impact of multiple trial errors deprived him or her of a fair proceeding even if the errors considered individually would not necessarily require reversal of a conviction. *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). In reviewing a claim

18

of cumulative error, an appellate court examines the entire trial record to assess the aggregate effect of multiple trial errors. 301 Kan. at 167-68. The assessment takes account of "how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence." *State v. Miller*, 308 Kan. 1119, 1176, 427 P.3d 907 (2018).

Robinson's argument fails at this juncture precisely because it is the sort of issue that should be raised in a direct appeal (and apparently was not in his case). By launching a cumulative error argument in a successive 60-1507 motion, Robinson has raised a claim rooted in trial errors appropriately considered on direct appeal. In turn, he is impermissibly deploying a habeas corpus proceeding as a second direct appeal. See *Rowland*, 289 Kan. at 1087; *Manco v. State*, 51 Kan. App. 733, 736, 354 P.3d 551 (2015). Robinson has not endeavored to identify a legally recognized "exceptional circumstance" that would lift that bar, allowing him to advance the cumulative error argument now. *Rowland*, 289 Kan. at 1087; *Wheeler v. State*, No. 122,956, 2021 WL 4808283, at *1 (Kan. App. 2021) (unpublished opinion) (exceptional circumstances include "unusual events," unanticipated changes in the law, and constitutionally deficient legal representation). We, therefore, decline to consider the claim.

Having reviewed and addressed Robinson's arguments, we find no reason to disturb the district court's denial of his second 60-1507 motion.

Affirmed.